RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NORTHEAST OHIO COALITION FOR THE HOMELESS;
COLUMBUS COALITION FOR THE HOMELESS; OHIO
DEMOCRATIC PARTY,

     *Plaintiffs-Appellees/Cross-Appellants,*

     *v.*

JON HUSTED, in his official capacity as Secretary of
the State of Ohio,

     *Defendant-Appellant/Cross-Appellee,*

STATE OF OHIO,

     *Intervenor-Appellant/Cross-Appellee.*

Nos. 16-3603/3691

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:06-cv-00896—Algenon L. Marbley, District Judge.

Argued: August 4, 2016

Decided and Filed: September 13, 2016

Before: KEITH, BOGGS, and ROGERS, Circuit Judges.

---

### COUNSEL

**ARGUED:** Stephen P. Carney, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants/Cross-Appellees. Subodh Chandra, THE CHANDRA LAW FIRM, LLC, Cleveland, Ohio, for Appellees/Cross-Appellants. **ON BRIEF:** Stephen P. Carney, Eric E. Murphy, Michael J. Hendershot, Ryan L. Richardson, Zachery P. Keller, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants/Cross-Appellees. Subodh Chandra, Sandhya Gupta, THE CHANDRA LAW FIRM, LLC, Cleveland, Ohio, Caroline H. Gentry, Ana P. Crawford, PORTER, WRIGHT, MORRIS & ARTHUS LLP, Dayton, Ohio, Donald J. McTigue, Jr. Corey Colombo, MCTIGUE MCGINNIS & COLOMBO, Columbus, Ohio, Donald J. McTigue, Jr. Corey Colombo, Derek S. Clinger, MCTIGUE & COLOMBO

LLC, Columbus, Ohio, for Appellees/Cross-Appellants.  Chad A. Readler, JONES DAY, Columbus, Ohio, Michael A. Carvin, Anthony J. Dick, Stephen A. Vaden, JONES DAY, Washington, D.C., for Amicus Curiae.

BOGGS, J., delivered the opinion of the court in which ROGERS, J., joined.  KEITH, J. (pp. 31–68), delivered a separate dissenting opinion.

————————

**OPINION**

————————

BOGGS, Circuit Judge.  In 2014, Ohio enacted Senate Bills 205 and 216.  Among other changes to Ohio election law, they (1) required county boards of elections to reject the ballots of absentee voters and provisional voters whose identification envelopes or affirmation forms, respectively, contain an address or birthdate that does not perfectly match voting records; (2) reduced the number of post-election days for absentee voters to cure identification-envelope errors, and provisional voters to present valid identification, from ten to seven; and (3) limited the ways in which poll workers can assist in-person voters.  The district court held that all three provisions impose an undue burden on the right to vote and disparately impact minority voters.

We affirm the plaintiffs' undue-burden claim only as it relates to the requirement imposed by Senate Bill 205 that in-person and mail-in absentee voters complete the address and birthdate fields on the identification envelope with technical precision.  We reverse the district court's finding that the other provisions create an undue burden.  We also reverse the district court's finding that the provisions disparately impact minority voters.  We affirm the district court's other holdings.

**I. Background**

Ohioans need not queue on Election Day to exercise the right to vote.  The State accepts absentee ballots by mail and, on designated early-voting days, in person.  Ohio Rev. Code §§ 3509.01(B), 3509.05(A).  A voter who declares that he or she is registered but whose name does not appear on a precinct's list of eligible voters can cast an in-person provisional ballot on either an early-voting day or Election Day.  *Id.* § 3505.181(A)(1), (B)(2).

In 2014, the Ohio General Assembly enacted Senate Bills 205 (SB 205) and 216 (SB 216), amending state election provisions that govern absentee and provisional voting. The laws have been in effect since early June 2014.

**A. SB 205**

Any eligible voter can apply for an absentee ballot. Ohio Rev. Code § 3509.03. Completing the application involves providing a name, signature, registration address, date of birth, and a form of identification. *Id.* § 3509.03(A)–(E). Acceptable identification includes: a driver's license number; the last four digits of a Social Security number; or a copy of a valid photo ID, valid military ID, current utility bill, bank statement, government check, paycheck, or other government document (excluding a registration notice) showing the voter's name and address. *Id.* § 3509.03(E). The same are acceptable forms of identification when casting an absentee ballot. *Id.* § 3509.05(A). Applicants can request and receive an absentee ballot through the mail by providing a mailing address. *Id.* § 3509.03(I).

When voting, mail-in and some in-person absentee voters must complete an "identification envelope" along with their ballots.[1] The identification envelope contains fields for the voter's name, signature, voting residence, and birthdate. The county boards of elections may preprint the voter's name and address on the identification envelopes of mail-in voters. *Id.* § 3509.04(B). The Secretary of State's 2015 election manual "instruct[s]" the boards to do so in order to "eliminate any chance that a voter's absentee ballot may be rejected for the sole reason" that the voter failed to complete those fields. Before SB 205 went into effect, absentee ballots could be rejected if the identification envelope "accompanying an absent voter's ballot or absent voter's presidential ballot [was] insufficient," if the signatures "d[id] not correspond with the person's registration signature," or if the voter failed to provide identification. Ohio Rev. Code § 3509.07 (2013). In 2010, the Secretary circulated a directive to the county boards of elections stating that the identification envelope *must* include a proper voter name and signature for the corresponding ballot to be counted.

---

[1]Some Ohio counties give early in-person voters the option to cast their ballots on a direct-recording electronic-voting machine. Those who do so are not also required to complete the identification envelope.

SB 205 added two fields to that list.  It specifies that an identification envelope is "incomplete" without accurately filled birthdate[2] and address fields.  Ohio Rev. Code § 3509.06(D)(3).  An "incomplete" identification envelope results in the ballot's rejection unless the voter "provide[s] the necessary information to the board of elections in writing and on a form prescribed by the secretary of state." *Id.* § 3509.06(D)(3)(b).

SB 205 made two other changes to Ohio election law that are at issue.  When an absentee ballot contains an error, the board of elections gives the voter notice of the additional information required for the ballot to be counted.  SB 205 reduced the window for voters to submit corrections from the ten days after Election Day to the seven days after Election Day.  *See ibid.* In addition, SB 205 prevents election officials from providing "assistance" to voters with the exceptions of voters who "[d]eclare[]" that they are "unable to mark" their ballot due to "blindness, disability, or illiteracy." *Id.* § 3505.24.

**B.  SB 216**

Provisional voters must complete a "provisional ballot affirmation" form.  Ohio Rev. Code § 3505.182.  Before the implementation of SB 216, a provisional ballot was counted if the voter presented valid identification[3] and the affirmation form included the voter's name, signature, and a statement of eligibility.  Ohio Rev. Code § 3505.183(B)(1) (2013).  The back of the form contained a separate registration application.  Provisional voters whose ballots were rejected for failure to register but who completed the application became registered for the next election.

SB 216 added birthdate[4] and address to the list of affirmation-form fields that provisional voters must accurately complete.  Ohio Rev. Code § 3505.183(B)(1)(a).  The affirmation form

---

[2]The birthdate requirement is satisfied if the voter provides a month and day of birth that match the month and day in the registration database, if the birthdate in the registration database is January 1, 1800, or if a majority of the four-member elections board find that the voter has met the name, address, signature, and identification requirements.  Ohio Rev. Code § 3509.06(D)(3)(a)(iii).

[3]The identification requirement for provisional voters is similar to that for absentee voters. *See* Ohio Rev. Code § 3505.18(A).

[4]The birthdate requirement for provisional voters has similar exceptions to those for the requirement for absentee voters. *See* Ohio Rev. Code § 3505.183(B)(3)(e).

now doubles as a registration application, applicable to provisional voters whose ballots are rejected for failure to register.  *Id.* § 3505.182(F).  The bill also added the word "printed" before "name" in the list of affirmation-form requirements.  *Compare id.* § 3505.183(B)(1)(a), *with* Ohio Rev. Code § 3505.183(B)(1)(a) (2013).  This appears to have clarified, rather than modified, existing law.  Between the 2008, 2010, and 2012 general elections, most counties rejected provisional ballots for failure to include a "printed" name.  Furthermore, a 2012 directive from the Secretary instructed elections boards to reject provisional ballots whose affirmation statements lacked "the voter's printed name."

A provisional voter without valid identification may return to the board of elections to cure an otherwise complete ballot by providing a driver's license number, state identification card number, the last four digits of the individual's Social Security number, a photo or military ID, or a copy of a current utility bill, bank statement, government check, paycheck, or other government document (excluding a registration notice) showing the voter's name and address.  Ohio Rev. Code § 3505.181(B)(7)(a).  SB 216 reduced the period for doing so from the ten days after Election Day to the seven days after Election Day.  *Compare* Ohio Rev. Code § 3505.181(B)(8) (2013), *with* Ohio Rev. Code § 3505.181(B)(7).

## C.  Procedural History

In 2006, the Northeast Ohio Coalition for the Homeless (NEOCH) and the Service Employees International Union sued the Secretary to enjoin the enforcement of voter-identification and provisional-ballot laws.[5]  Although perhaps rich source material for a prickly civil-procedure hypothetical, the case's many twists and turns are unnecessary to chronicle here.  Suffice it to say, litigation was still proceeding in 2010 when the parties entered a consent decree.

Ohio's eighty-eight counties have four-person boards responsible for administrating local elections.  The 2010 decree required the Secretary to inform elections boards to count the provisional ballots of registered voters whose affirmation forms included an accurate name,

---

[5]Within days of the plaintiffs' filing suit, Ohio intervened as a defendant.  *See* Fed. R. Civ. P. 24(b).  With the parties' consent, the Ohio Democratic Party (ODP) intervened as a plaintiff in 2008.  Soon after, the Columbus Coalition for the Homeless (CCH) was added as a plaintiff.

verified signature, and the last four digits of the voter's Social Security number. It also listed grounds on which provisional ballots could not be rejected, including failure to "provide a date of birth" or "address . . . tied to a house, apartment or other dwelling [if] the voter indicated that he or she resides at a non-building location."**[6]** The Secretary was required to give the court notice of changes to the law that would "supersede" the decree.

The decree was in effect for the 2010 and 2012 elections. Although it was originally set to expire on June 30, 2013, the court, on the plaintiffs' motion, extended it through the end of 2016. In September 2014, the Secretary informed the court that SB 216's rejection requirement for imperfect birthdate and address fields, and the three-day reduction in the cure-period, "automatically amended" the decree.

The plaintiffs moved for leave to file a supplemental complaint. *See* Fed. R. Civ. P. 15(d). They petitioned the court to permanently enjoin the Secretary from implementing portions of SB 205 and SB 216. The defendants opposed. In August 2015, the court granted the motion because SB 216 "ero[ded]" the consent decree's protections and because both SB 205 and SB 216 related to the original complaint, which challenged Ohio's voter-identification requirements more generally.

The supplemental complaint asserts ten counts: a viewpoint-discrimination claim under the First and Fourteenth Amendments; claims under the Fourteenth Amendment's Due Process Clause of a fundamentally unfair voting system and violation of procedural due process; claims under the Fourteenth Amendment's Equal Protection Clause of an undue burden, lack of uniform standards, and arbitrary and disparate treatment; a claim of intentional discrimination in violation of the Fourteenth and Fifteenth Amendments; and literacy-test, immaterial-error, and vote-denial claims under the Voting Rights Act (VRA).

The court presided over a bench trial in March 2016. Over the course of twelve days, it heard the testimony of more than twenty board of elections officials from different counties, two

---

**[6]**Ohio law requires elections boards to "examine any additional information" in addition to "determin[ing] whether the individual who cast the provisional ballot is registered and eligible to vote in the applicable election" in order to "determine whether a provisional ballot is valid and entitled to be counted." Ohio Rev. Code. § 3505.183(B)(1)–(2). The original complaint alleged that elections boards would not "apply the same standards when . . . determining whether provisional ballots are eligible to be counted."

members of the Ohio General Assembly, the Assistant Secretary of State (who also serves as "head of elections"), and two members of the Ohio Association of Election Officials (OAEO), which includes members of the elections boards of every Ohio county and has equal representation from the two major parties. In addition, the record includes declarations of absentee and provisional voters whose ballots were rejected for birthdate and address errors. Several, for example, wrote the current date instead of their birthdates. One transposed the location of the digits indicating the month and day of his birth despite specific language on the form to the contrary because he grew up in a country that follows the date sequence used elsewhere in the world.

The court was also presented with opinion testimony from Dr. Jeffrey Timberlake for the plaintiffs, and Drs. Nolan McCarty and M.V. Hood, III, for the defendants. Because Ohio does not record the race or ethnicity of its voters, Timberlake used county-level data to make inferences about the relationship between voter race and the use or rejection of absentee and provisional ballots. He examined data from the 2008, 2010, 2012, and 2014 general elections.

Timberlake divided counties into "high minority" and "low minority" groups, and performed a regression assessing the correlation between a county's percent minority and absentee and provisional ballot use and rejection. Two of his models controlled for urbanicity, and the age, education, and income of the white population. In those models, Timberlake observed "some evidence, though not very strong evidence, that absentee ballots are used more heavily by voters in high-minority counties." He found "much stronger" evidence of higher rates of absentee-ballot *rejection* among African-American voters. All four elections showed higher use and rejection rates of provisional ballots in higher-minority counties, even when controlling for urbanicity and the three white-population characteristics.

The district court's opinion gave "great weight" to Timberlake's conclusions. It found that the defense expert witnesses did not refute Timberlake's report. The court next considered nine nonexhaustive factors from *Thornburg v. Gingles*, 478 U.S. 30 (1986), "that might be probative" of a violation of Section 2 of the VRA. *Id.* at 36; *id.* at 36–37. In particular, the court concluded that the evidence on the record did not support Ohio's justifications for enacting SB 205 and SB 216.

Ultimately, the court entered judgment for the plaintiffs on their undue-burden and vote-denial claims, and for the defendants on all other counts. It permanently enjoined the enforcement of the portions of SB 205 and SB 216 that: require boards to reject the ballots of absentee and provisional voters who do not accurately complete the address and birthdate fields; reduce the cure period to seven days; prohibit most forms of poll-worker assistance; and require provisional voters to print their names on the affirmation form.

Ohio appeals the entry of judgment for the plaintiffs on the undue-burden and vote-denial claims. Additionally, it contends that the court improperly approved the supplemental complaint, that the plaintiffs should have been precluded from bringing their challenges, and that they lack standing. The plaintiffs cross-appeal the entry of judgment for Ohio on the uniform-standards, literacy-test, due-process, intentional-discrimination, and immaterial-error claims.

## II.  Claim Preclusion and Standing

Ohio argues that all three plaintiffs, and the Ohio Democratic Party (ODP) at the very least, are bound by the district court's decision in *Ohio Org. Collaborative v. Husted*, No. 2:15-cv-1802, 2016 WL 3248030 (S.D. Ohio May 24, 2016). If claim preclusion prevents ODP from proceeding, Ohio asserts, we should next consider its argument that the remaining plaintiffs, NEOCH and the Columbus Coalition for the Homeless (CCH), lack standing. That one-two punch is too clever by half. Even if ODP were bound by *Ohio Org. Collaborative* (an issue on which we need not opine),[7] NEOCH and CCH are not. And they have standing to bring suit.

For the first time on appeal, Ohio contends that NEOCH and CCH are precluded from bringing their claims because of a decision in a suit in which ODP was a party that was issued two weeks before the district-court judgment in this case. Even assuming that Ohio did not waive this argument by failing to raise it before the district court, *see Mun. Resale Serv. Customers v. FERC*, 43 F.3d 1046, 1052 n.4 (6th Cir. 1995), it is without merit. "The general rule" of claim preclusion "provides that when a court of competent jurisdiction has entered a

---

[7]In August 2015, plaintiff Ohio Organizing Collaborative moved to substitute three parties in its place, including ODP, and to "drop . . . claims that overlap with those in" this case. Ohio opposed the latter motion. The court granted the substitution request but denied the motion to amend. *Ohio Org. Collaborative v. Husted*, No. 2:15-cv-1802 (S.D. Ohio Sept. 2, 2015) (opinion and order).

final judgment on the merits of a cause of action, the parties to the suit and their privies are thereafter bound . . . 'as to every matter which was offered and received to sustain or defeat the claim or demand.'" *Commissioner v. Sunnen*, 333 U.S. 591, 597 (1948) (quoting *Cromwell v. County of Sac*, 94 U.S. 351, 352 (1876)). "[I]n certain limited circumstances," a nonparty is "adequately represented by someone with the same interests who is a party." *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989). However, "to bind litigants to a judgment rendered in an earlier litigation to which they were not parties and in which they were not adequately represented" would violate due process. *Richards v. Jefferson County*, 517 U.S. 793, 794 (1996) (citing *Hansberry v. Lee*, 311 U.S. 32 (1940)).

An essential element of adequate representation is that "[t]he interests of the nonparty and her representative are aligned." *Amos v. PPG Indus., Inc.*, 699 F.3d 448, 452 (6th Cir. 2012) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 900 (2008)). Citing *Amos*, Ohio suggests that the "aligned interests" of ODP and the other plaintiffs "are shown by the fact that they co-litigated *this* case with joint pleadings." First Br. 58. The lax approach to nonparty preclusion implied by that reasoning would unmoor the requirement of "adequacy" from the anchor of "representation." "Representative capacity must be established . . . by private or public appointment"—not by the assertions of a "self-appointed volunteer," and certainly not by acting as co-parties in a *later* suit. 18A Charles Alan Wright , Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4454 (2d ed. 2002). ODP did not represent NEOCH and CCH in *Ohio Org. Collaborative*.

Further, mere overlapping interest will not work to preclude a nonparty from litigating a claim that a putative representative tried earlier. *See Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 193 F.3d 415, 424 (6th Cir. 1999) (en banc) (rejecting claim of "virtual representation" when nonparty and supposed representative lacked "legal relationship"). Nor does Ohio point to any indication that "special procedures" were put in place to protect the interests of NEOCH and CCH in *Ohio Org. Collaborative*. *Amos*, 699 F.3d at 452. NEOCH and CCH are therefore not bound in this case by an earlier judgment against ODP.

Whether a party has standing is a legal question that appellate courts review de novo. *Shearson v. Holder*, 725 F.3d 588, 592 (6th Cir. 2013). When one party has standing to bring a

claim, the identical claims brought by other parties to the same lawsuit are justiciable. *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999). Because NEOCH has organizational standing, we do not reach Ohio's other arguments regarding NEOCH's and CCH's standing to bring suit.

To establish standing, a plaintiff must show a concrete and particularized injury that is actual or imminent, a causal connection between the injury and the conduct complained of, and likelihood that a favorable decision will redress the injury. *H.D.V.-Greektown, LLC v. City of Detroit*, 568 F.3d 609, 616 (6th Cir. 2009). In addition to suing on behalf of its members, an entity may sue "on its own behalf because it has suffered a palpable injury as a result of the defendants' actions." *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 332–33 (6th Cir. 2002).

Ohio points to our recent decision in *Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014), and argues that NEOCH and CCH have suffered no injury. In that case, we held that an organization that had conducted voter outreach lacked standing to challenge absentee-ballot procedures permitting hospitalized voters to obtain absentee ballots later than jailed voters. *Id.* at 459. The bases offered to support its injury claim—instructing election volunteers who were already being trained in current absentee-voting procedures and speculation that the law compelled the group to divert resources—were insufficient. *Id.* at 459–60.

Unlike the plaintiff organization in *Fair Elections* that challenged then-existing voting law, NEOCH takes issue with newly enacted provisions. That distinction is not just academic. Whereas the *Fair Election* plaintiff merely exhausted "efforts and expense [in] advis[ing] others how to comport with" *existing* law, *id.* at 460, NEOCH has immediate plans to mobilize its limited resources to revise its voter-education and get-out-the-vote programs on account of SB 205 and SB 216. In the past, NEOCH focused on educating and assisting the homeless with mail-in voting. Given the changes ushered in by SB 205 and SB 216, NEOCH determined that its resources are better spent assisting the homeless in participating in early in-person voting. To that end, it plans to redirect its focus for the 2016 general election by encouraging early in-person voting and driving homeless voters to the polls. It reports that this will require more volunteers, time, and expenditures. That is not simply the "effort and expense" associated with advising voters how to "comport" with the law, *ibid.*, but an overhaul of the get-out-the-vote

strategy of an organization that uses its limited resources helping homeless voters cast ballots. Their injury is imminent, as well as concrete and particularized.

Standing must exist as to each claim, however, and cannot be "dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.4 (1996). But the record demonstrates that NEOCH has standing for its VRA claims as well. The injury suffered by NEOCH, as noted above, is directly related to SB 205 and SB 216's alleged impact on the opportunity to vote of the African-American community. Because their allegations indicate that the burden would cause them to change significantly their expenditures and operation and a favorable decision would redress that injury, NEOCH has organizational standing here as well. Finally, with regard to the cause of action, the VRA permits suit by the Attorney General or aggrieved voters, *see Allen v. State Bd. of Elections*, 393 U.S. 544, 557 (1969), but the Supreme Court has permitted organizations to bring suit in VRA claims, *see Ala. Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015).

## III. Supplemental Pleadings

The district court did not abuse its discretion by granting the plaintiffs' motion to file a supplemental complaint. A district court may "permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Rule 15(d) aims "to give the court broad discretion in allowing a supplemental pleading." Fed. R. Civ. P. 15(d) advisory committee's note to 1963 amendment.

We review for abuse of discretion. *See Spies v. Voinovich*, 48 F. App'x 520, 527 (6th Cir. 2002). A district court abuses its discretion by relying on an incorrect legal standard, misapplying the correct legal standard, or judging the outcome based on clearly erroneous factual findings. *Paterek v. Village of Armada*, 801 F.3d 630, 643 (6th Cir. 2015).

Here, the court found that the original and supplemental complaints were sufficiently linked because SB 216 superseded the consent decree's protections and because both provisions allegedly imposed burdens that would impede voting in similar ways as the voter-identification provisions originally challenged. "In essence," the court found, "the 'focal points' of both

complaints are the same: ensuring all ballots, but particularly provisional and absentee ballots, . . . are not unfairly excluded and left uncounted due to illegal voter identification rules."

In so concluding, the court carefully applied the correct legal standard and did not make clearly erroneous factual findings. The supplemental complaint revolved around new election laws that affected the terms of a longstanding consent decree that resolved an even lengthier dispute. So, Defendants' reliance on *Leisure Caviar*, 616 F.3d at 616, which addressed the issue of newly discovered evidence after entry of judgment, is misplaced. *See* First Br. 56. The district court did not clearly err when it found that the plaintiffs' primary grievance with both sets of provisions was that methods of voter identification caused elections boards to disproportionately reject homeless voters' absentee and provisional ballots. The interest of judicial economy, although not necessarily enough in and of itself, also militates in favor of allowing supplemental pleadings. When a dispute is complicated and protracted, and a new complaint the likely alternative, allowing supplemental pleadings before a court already up to speed is often the most efficient course.

## IV. Voting Rights Act Claims

All three VRA claims are contested on appeal. Ohio appeals the judgment on the vote-denial claim. The plaintiffs appeal the judgment on the literacy-test and materiality claims.

### A. Vote Denial or Abridgment

#### 1. Legal Framework

We review the district court's legal conclusions de novo and factual findings for clear error. *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488, 492 (6th Cir. 2005). "Under the clear-error standard, we abide by the court's findings of fact unless the record 'le[aves] [us] with the definite and firm conviction that a mistake has been committed.'" *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013) (alterations in original) (quoting *United States v. Gardner*, 649 F.3d 437, 442 (6th Cir. 2011)).[8]

---

[8]Although the dissent repeatedly classifies our review as de novo, our approach is consistent with established precedent in reversing the district court where the overall record is inconsistent with the findings.

In *City of Mobile v. Bolden*, 446 U.S. 55 (1980), the Supreme Court held that racially neutral state action did not fall within the ambit of VRA Section 2. Congress countered by amending Section 2. That response "ma[d]e clear" to the Court "that a violation [of Section 2] could be proved by showing discriminatory effect alone." *Gingles*, 478 U.S. at 35. Section 2 now reads:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301 (Supp. II Vol. III 2015). The statute operates as a "permanent, nationwide ban," *Shelby County v. Holder*, 133 S. Ct. 2612, 2631 (2013), on "even the most subtle forms of discrimination," *Chisom v. Roemer*, 501 U.S. 380, 406 (1991) (Scalia, J., dissenting).

"The essence of a [Section] 2 claim" is the assertion that a challenged provision "interacts with social and historical conditions" to cause an inequality of opportunity for racial minority voters. *Gingles*, 478 U.S. at 47. Evaluating that allegation "requires 'an intensely local appraisal of the design and impact' of the contested electoral mechanisms." *Id.* at 79 (quoting *Rogers v. Lodge*, 458 U.S. 613, 622 (1982)). Section 2 claims involve either vote denial or vote dilution. Examining a vote-dilution claim in *Gingles*, the Supreme Court embraced nine nonexhaustive factors as relevant in assessing "the totality of circumstances" for establishing a Section 2

---

*See, e.g., Indmar Prod. Co. v. Comm'r*, 444 F.3d 771, 778 (6th Cir. 2006) ("[W]hile our review is deferential, it is not nugatory.").

violation. Because the Court has yet to consider a Section 2 vote-denial claim after *Gingles*, the standard for such adjudication is unsettled.

In *Ohio State Conference of the NAACP v. Husted*, 768 F.3d 524 (6th Cir. 2014), we stated the analytical framework for Section 2 vote-denial claims as a two-part test: (1) "[T]he challenged 'standard, practice, or procedure' must impose a discriminatory burden on members of a protected class, meaning that members of the protected class 'have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice,'" and (2) "that burden must in part be caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class." *Id.* at 554 (quoting 52 U.S.C. § 10301 (Supp. II Vol. III 2015) and *Gingles*, 478 U.S. at 47). The *Ohio State Conference* panel affirmed an order preliminarily enjoining Ohio from reducing early in-person voting for the 2014 general election. The Supreme Court stayed that order. *Husted v. Ohio State Conference of NAACP*, 135 S. Ct. 42 (2014). Because the injunction applied only to the upcoming election, the panel vacated its opinion—including its articulation of the Section 2 vote-denial test. *Ohio State Conference of the NAACP v. Husted*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014). On remand to the district court, the parties reached a settlement.

Two circuits have since adopted the *Ohio State Conference* test. *See Veasey v. Abbott*, ___ F.3d. ___, No. 14-41127, 2016 WL 3923868, at *17 (5th Cir. July 20, 2016) (en banc); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014). The district court used it in this case, and a recent Sixth Circuit panel found it "helpful" in determining a Section 2 vote-denial claim. *Ohio Democratic Party v. Husted*, ___ F.3d ___, 2016 WL 4437605, at * 13 (6th Cir. Aug. 23, 2016) (evaluating a vote-denial claim using the *Ohio State Conference* framework, with additional clarification).

Ohio argues that the two-part test goes awry in two ways. Whether the district court did in fact mischaracterize the test is irrelevant, however. At the very least, a successful Section 2 claim requires the plaintiffs to prove disparate impact. The plaintiffs failed to prove that SB 205 and SB 216 have a disparate impact on African-American voters. Therefore, analysis of any test beyond disparate impact is unnecessary.

**2. SB 205 and SB 216**

The district court found that "Timberlake's data on disparities in provisional and absentee ballot usage and rejection rates reveal that higher minority population share is correlated to higher rates of absentee ballot rejection and provisional ballot usage and rejection." Based on that analysis, it concluded that SB 205 and SB 216 make "African-American voters . . . more likely than white voters to have their absentee or provisional ballots rejected." The record would indicate otherwise.

For starters, Timberlake's regression analysis simply does not support the conclusion that SB 205's address and birthdate perfection requirement, or its limitation on poll-worker assistance, disparately impact minority voters. When controlling for urbanicity and the age, income, and education of the white population, Timberlake found that for every additional one percent minority in a county, use of absentee ballots increased by a small amount in the 2008 and 2010 general elections—134.2 and 195.2, respectively, for every 100,000 voting-age residents— but *decreased* by 99.5 and 96.6 ballots in the 2012 and 2014 general elections.[9] He therefore found that the evidence to support the conclusion that high-minority counties use absentee ballots more heavily was "not very strong."

Certainly additional absentee ballots are rejected on account of the perfection requirement. But there is scant evidence in the record that minority voters are more likely to cast absentee ballots than white voters. It would therefore be illogical to infer that rejecting absentee ballots for failure to accurately complete address and birthdate fields disproportionately affects minority voters without some other evidence that minority voters are less likely to fulfill those requirements. And, as discussed in more detail elsewhere, the vast majority of absentee-ballot rejections are for reasons other than those challenged here.

The same is true of the limits that SB 205 places on poll workers. To be sure, the provision will impact the hypothetical early in-person absentee voter whose ballot would have been rejected in past elections but for now-prohibited forms of assistance. Yet the record contains no evidence of how many, if any, voters received such additional "assistance." Because

---

[9]Timberlake did not separately analyze in-person absentee voting and mail-in absentee voting.

evidence of higher minority absentee-ballot usage is weak, and the record does not indicate that minority voters disproportionately benefited from assistance that is now proscribed, plaintiffs have not demonstrated a disparate impact.

On their other Section 2 claims, the plaintiffs fail to show that the challenged provisions will have much of an impact on the right to vote at all. The district court reasoned that reducing the cure period from ten to seven days would burden illiterate voters and voters for whom travelling to cure their ballots presents logistical difficulties. Hypothetically speaking, a scenario could exist where voters showed up in droves to correct absentee-ballot errors and to produce provisional-ballot ID during those three days. But that has not been the case in Ohio. In fact, the single election-board official whose trial testimony the district court cited in support of its conclusion stated that in Hamilton County, Ohio's third most populous, "very few voters" cured their ballots during that three-day window. The record contains no evidence on the number of absentee or provisional voters who took advantage of the cure days eliminated by SB 205 and SB 216. A law cannot disparately impact minority voters if its impact is insignificant to begin with.

Challenges to SB 216's perfection requirement of provisional voters and its limitation on poll-worker assistance suffer from the same shortcoming. The conclusion that SB 216 disproportionately impacts minority voters is not borne out in the data. For the vast majority of provisional voters whose ballots are rejected, no amount of help would change the result. The record contains provisional voting data for the 2008, 2010, 2012, 2014, and 2015 general elections. In every one of those elections, eighty to ninety percent of provisional voters whose ballots were rejected either had failed to register at all or voted in the wrong place. Placing a minor check on election workers' interactions with in-person voters has no impact on the vast majority of provisional-ballot rejections.

SB 216 has been in effect during the two most recent general elections. The provisional ballots of 247 voters in 2014 and 373 voters in 2015 were rejected for failure to provide an accurate birthdate or address. Respectively, these figures represented about five and three percent of rejected provisional ballots—and less than one percent of all provisional ballots cast. What is more, the 2015 figure does not account for individuals whose 2014 ballots were rejected

for failure to register but who accurately completed the affirmation form and successfully registered for the next election. Presumably, some of those voters would not have registered otherwise, which means that SB 216 has the effect of reducing the number of ballots rejected on the basis of nonregistration in future elections. That impact helps to counter the small impact that SB 216 does have. Given the negligible impact of SB 216's perfection requirement on ballot rejection, the plaintiffs have not shown that the provision disproportionately affects minority voters.

## B. Literacy Test

Section 4 of the VRA provides that "[n]o citizen shall be denied" the right to vote "because of his failure to comply with any test or device." 52 U.S.C. § 10501(a) (Supp. II Vol. III 2015). "Test or device" is defined as a requirement that, as a prerequisite to vote or register, a person demonstrate the ability to "read, write, understand, or interpret any matter," demonstrate "educational achievement" or "knowledge" of any subject, "possess good moral character," or have others "vouch[]" for them. *Id.* § 10501(b).

The district court found that § 10501 includes a private right of action before concluding that the challenged provisions do not violate the statute. Even if a private right of action is permitted, we agree with the district court that SB 205 and SB 216 do not impose a "test or device" on Ohio voters.

The plaintiffs equate the requirement that absentee and provisional voters accurately complete address and birthdate fields with the "vague, arbitrary, hypertechnical or unnecessarily difficult" tests cited by Congress as evidence of the urgent need for the VRA. H.R. Rep. No. 89-439, at 13 (1965). However, requiring voters' most basic biographical and personal information bears no similarity to selectively enforced voting tests whose "only real function" is to "foster racial discrimination." *Ibid.*; *see also id.* at 12 (citing *United States v. Louisiana*, 225 F. Supp. 353, 358 (E.D. La. 1963) (three-judge panel finding a Louisiana Constitution requirement that registration applicants be able to read and "give a reasonable interpretation" of any clause of the Louisiana or United States Constitution violated Fourteenth and Fifteenth Amendments), *aff'd*, 380 U.S. 145 (1965)); S. Rep. 89-162, pt. III, at 11–12 (1965) (cataloging cases of

"discriminatory misuse" of literacy tests and "good moral character" requirements).   The address-and-birth-date requirements simply do not fall within the meaning of "test or device," as used in the statute.   52 U.S.C. § 10501(b).   To the extent that the House Report censures "'perfect form' requirements," no such prohibition appears in the text of the statute itself. *Compare* H.R. Rep. 89-439, at 13, *with* 52 U.S.C. § 10501.   In these circumstances, the unambiguous language of the statute must prevail.  *See Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 394 (6th Cir. 2016) (heeding Supreme Court's "admonishment to courts not to add any unexpressed requirements to the language of the statute" (quoting *Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 818 (6th Cir. 2002))).

To the extent that recording birthdate or address proves difficult for some voters, Ohio explicitly permits election officials to assist those who are blind, disabled, or illiterate in marking their ballots.  *See* Ohio Rev. Code §§ 3505.24(B), 3505.181(F).  The plaintiffs' supposition that the stigma of illiteracy deters some voters from requesting assistance distracts from the focus of the inquiry—state action.  To fill the address and birthdate fields, voters need not "demonstrate the ability" to read or write any more so than they do to otherwise complete a ballot.

### C. Immaterial Error

The VRA provides that no one acting under color of law may "deny the right of any individual to vote in any election because of an error or omission" on a registration application or voting ballot if the error or omission "is not material" in determining whether the individual is qualified to vote.  52 U.S.C. § 10101(a)(2)(B) (Supp. II Vol. III 2015).  A later subsection of § 10101 states that when any person has deprived another of "any right or privilege secured by subsection (a) . . . , the Attorney General may institute for the United States . . . a civil action or other proper proceeding for preventive relief."  *Id.* at § 10101(c).

We have held that the negative implication of Congress's provision for enforcement by the Attorney General is that the statute does not permit private rights of action.  *See McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000).  Another circuit later reached the opposite conclusion.  *See Schwier v. Cox*, 340 F.3d 1284, 1294–96 (11th Cir. 2003).  It reasoned, in part, that the Supreme Court had found other VRA sections enforceable by private right of action

despite their provision for Attorney General enforcement and that before the Attorney General language was appended to the statute, plaintiffs "could and did" bring enforcement actions under 42 U.S.C. § 1983. *Id.* at 1295.

"A panel of this court may not overturn binding precedent because a published prior panel decision 'remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" *United States v. Elbe*, 774 F.3d 885, 891 (6th Cir. 2014) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)). *McKay v. Thompson* therefore binds this panel. The plaintiffs may not bring an action for a violation of § 10101(a).

## V.  Equal-Protection Claims

Three equal-protection questions are at issue on appeal: Whether the challenged provisions (1) unduly burden the right to vote; (2) result in a lack of uniform standards; and (3) were enacted with a discriminatory purpose. Once again, we review the district court's legal conclusions de novo and factual findings for clear error.

### A.  Undue Burden

#### 1.  Legal Standard

The certainty that every election law places at least some burden on individual voters demands that courts weigh that hindrance against the provision's regulatory justification. On one hand, "voting is of the most fundamental significance under our constitutional structure." *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979). On the other, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Acknowledging this tension, the Supreme Court has articulated a "flexible standard" to apply when considering challenges to state election law:

> A court . . . must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as

justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

In practice, the level of scrutiny into a challenged election law varies based on the severity of its constraint on voting rights. "[S]evere restriction[s]" must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992). At the other end of the spectrum, "minimally burdensome and nondiscriminatory" regulations inevitably result in "a less-searching examination." *Ohio Council 8 Am. Fed'n of State v. Husted*, 814 F.3d 329, 335 (6th Cir. 2016). For regulations that "fall[] somewhere in between the two extremes, 'the burden on the plaintiffs is weighed against the state's asserted interest and chosen means of pursuing it.'" *Ibid.* (quoting *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 546 (6th Cir. 2014)) (alteration omitted). As a general matter, "important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788.

In striking portions of SB 205 and SB 216, the district court considered the burdens that the provisions impose on NEOCH's and CCH's homeless and illiterate members. Zeroing in on the abnormal burden experienced by a small group of voters is problematic at best, and prohibited at worst. In *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008), the Supreme Court upheld an Indiana voter-ID law. The plaintiffs urged the Court to consider the burden imposed on the "narrow class of voters" who could not afford or obtain a birth certification and had to return to the circuit court clerk's office after voting. *Id.* at 200 (opinion of Stevens, J.). The lead opinion refrained from weighing the "special burden" faced by "a small number of voters" because the evidence on the record gave "no indication of how common the problem is," which made it impossible "to quantify . . . the magnitude of the burden." *Id.* at 200, 202. A concurrence rejected outright the idea of measuring the burden on a subset of voters. "[W]hat petitioners view as the law's several light and heavy burdens," it reasoned, "are no more than the different *impacts* of the single burden that the law uniformly imposes on all voters." *Id.* at 205 (Scalia, J., concurring in the judgment).

In any event, the district court erred by weighing Ohio's regulatory interests against the burden that the challenged provisions uniquely place on homeless and illiterate voters.[10] Even under the controlling opinion's more liberal approach to burden measuring, the record here is devoid of quantifiable evidence from which an arbiter could gauge the frequency with which this narrow class of voters has been or will become disenfranchised as a result of SB 205 and SB 216. We therefore consider the burden that the provisions place on all Ohio voters.

### 2. SB 205 and SB 216

*Address and Birthdate Requirements.* Requiring boards of elections to reject the ballots of absentee and provisional voters who fail to accurately complete birthdate and address fields directly and measurably disenfranchises some voters. As discussed, *see supra* p. 16, in the 2014 and 2015 general elections, 620 provisional ballots were rejected as failing to meet SB 216's address and birthdate perfection requirements, out of a total of 16,942 rejections. Among over 860,000 domestic civilian absentee ballots cast in 2014 and 430,000 in 2015, 1378 ballots were rejected in 2014, and 334 in 2015, for failure to comply with the similar provision in SB 205.[11]

Considering the number of total ballots cast in a general election in Ohio, these figures are small. And yet, as demonstrated through voter declarations and the testimony of board officials, the formal rigidity of the challenged requirements may leave no room for elections boards to make their own judgments on voter eligibility. As a result, identifiable voters may be disenfranchised based only on a technicality. For example, transposing the location of the month and year numerals of a birthdate, writing the current date by mistake, and inverting digits in an address have been cited by elections boards as reasons for automatic ballot rejection.

A facial challenge to a state law fails "where the statute has a 'plainly legitimate sweep.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting

---

[10]Illiterate voters may request and receive assistance in marking their ballots from nearly "any person of the[ir] . . . choice," including "two election officials of different political parties." Ohio Rev. Code. § 3505.24. Homeless voters may register their address as "a shelter or other location at which the person has been a consistent or regular inhabitant and to which the person has the intention of returning." *Id.* § 3503.02(I).

[11]In addition, 633 domestic civilian absentee ballots were rejected in 2014, and 346 in 2015, because the voter ID envelope "[c]ontains [i]nsufficiient [sic] [i]nformation." *Cf.* Ohio Rev. Code § 3509.07(A).

*Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997) (Stevens, J., concurring in the judgments)).  For SB 216, the interest in registering provisional voters outweighs the burden of completing the address and birthdate fields.  Most provisional-ballot rejections occur in Ohio because the purported voter was not registered.  In 2012, a presidential-election year, over 20,000 provisional ballots were rejected for failure to register.  Ohio uses the affirmation form to register the unregistered provisional voters who unsuccessfully try to cast ballots each year.

The additional fields also help elections boards positively identify provisional voters.  For their ballots to be counted, provisional voters must be located in a statewide database of registered voters.  Predictably, entering a provisional voter's name and the last four digits of their Social Security number into the database can result in multiple hits.  Birthdate and address information can narrow the plausible registered voters and assist in confirming an eligible voter's right to vote (and vice versa).  Ohio's important interests in provisional-voter registration and identification eclipse the small burden of accurately completing the two fields—a burden that actually impacts just a few hundred voters each election, an impact wholly in their own control.

However, we agree with the district court that Ohio has made no such justification for mandating technical precision in the address and birthdate fields of the absentee-ballot identification envelope.  Although the burden is small for most voters, its impact is greater than that of SB 216, and none of the "precise interests put forward by" Ohio justifies it.  *Burdick*, 504 U.S. at 434 (citation omitted).  Ohio first posits that the perfection requirement hampers "rare[]" attempts to cast others' mail-in absentee ballots.  First Br. 30.  Combatting voter fraud perpetrated by mail is undeniably a legitimate concern.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).  Yet some level of specificity is necessary to convert that abstraction into a definite interest for a court to weigh.  The district court found that Ohio did not even "offer[] combatting voter fraud" as a relevant interest.  Given the lack of any coherent fraud argument offered at trial, that conclusion is understandable.

Moreover, Ohio's argument collapses under scrutiny.  Before SB 205, absentee voters had to clear several hurdles to confirm their identity.  In addition to presenting valid identification, a voter needed the signature on the envelope to match the voter's registration signature, and even then, the information in the identification envelope could be deemed

"insufficient." Ohio Rev. Code § 3509.07 (2013); *see also id.* §§ 3509.05–.06, 3511.09. Like all other ballots, those of absentee voters could be challenged "for cause." *Id.* § 3509.07. Under some circumstances, certain errors in address or birthdate could well constitute "insufficiency." SB 205 altered that provision, *requiring* boards to reject absentee ballots that do not include an accurate address and birthdate for the voter.

Even Ohio recognizes that the downside of rejecting mail-in absentee ballots for address errors overshadows any concern with address falsification. Ohio statute allows, and the Secretary has instructed, boards of elections to complete the address field on mail-in identification envelopes so that ballots are not thrown out "for th[at] sole reason." At bottom, Ohio's interest revolves around the "rare" instances where a fraudster manages to swipe the ballot of a registered absentee voter, forge the signature, and return the ballot to the board of elections with a copy of the voter's identification, driver's license number, or Social Security number, and would have gotten away scot free but for the troublesome birthdate requirement. What is more, Ohio does not explain why its interest in preventing voter fraud by mail makes it "necessary to burden" the plaintiffs' voting rights. *Burdick*, 504 U.S. at 434 (citation omitted). Before SB 205, boards were instructed to strike ballots if the identification envelope contained "insufficient" information and had discretion to "challenge" absent voters "for cause." Ohio Rev. Code § 3509.07 (2013). That provision gave boards more than sufficient flexibility to investigate birthdate errors for fraud without the heavy-handed requirement of ballot rejection on a technicality.

At trial, the district court was not presented with a shred of evidence of mail-in absentee-voter fraud. That absence of support is corroborated by ample testimony. Halfway through trial, the court held a sidebar where it asked counsel for Ohio whether a fraud argument was "going to be a part of the presentation of . . . [Ohio's] case in chief, . . . experts, [or] other witnesses." Counsel stated that the court "w[ould] hear testimony" about the interests motivating the passage of the bills, including fraud. Not only did that never materialize, but, as is apparent from the record, there is no indication of a legitimate fraud concern at all. The Assistant Secretary of State, responsible for managing statewide elections, affirmed upon cross-examination that the possibility of this particular voter fraud is "infinitesimal" and would not have been "an

appropriate justification" for SB 205's perfection requirement. None of the officials who testified from nearly a quarter of Ohio's boards of elections were even asked whether requiring perfection on the birthdate field would combat mail-in absentee-voter fraud. At the court's own prodding, several answered questions related to fraud. The few who could relate instances of fraud identified none relating to the specific interest now asserted. This suggests that the fraud interest does not offset the burden of technical perfection on the identification envelope's address and birthdate fields.

Ohio also asserts an interest in standardizing its identification-envelope requirements. Achieving uniform standards across eighty-eight autonomous county boards of elections is a commendable goal. A court weighing that interest, however, must ask, "Standardization to what end?" For example, a standardized ballot may increase public confidence in the integrity of the electoral process. *See Crawford*, 553 U.S. at 235 (Souter, J., dissenting). According to Ohio, SB 205's perfection requirement "increases efficiency and predictability." First Br. 32.

In support, Ohio cites just two pieces of evidence. During his testimony, the Assistant Secretary of State stated that before the implementation of SB 205, the birthdate field was "a required element on the [identification envelope, but] was not a required element for the Board to determine the validity of the ballot." Although true, that statement does not address whether that distinction was thought by anyone to make election administration less efficient. Ohio also points to a report of the OAEO advising that requiring mail-in voters to complete the address and birthdate fields, among other measures, would "allow election officials to more efficiently process mail-in absentee ballots." However, that document was silent with regard to in-person absentee ballots. Moreover, it was not a recommendation to *reject* ballots containing technical errors, and so cannot support the argument that a uniform *rejection* standard increases efficiency.

Nor does Ohio's interest in uniformity "make it necessary to burden" the right to vote with a technical-perfection requirement. *Burdick*, 504 U.S. at 434 (citation omitted). Even before SB 205, Ohio law instructed boards of elections on the information to include in absentee-voter identification envelopes. *See* Ohio Rev. Code § 3509.04(B) (2013). It would seem that the simple act of amending that provision to more comprehensively describe the information that identification envelopes should contain would have been a less roundabout way to uniformity—

and would not have needlessly disenfranchised voters. In addition, Ohio publishes a lengthy manual for election officials with extensive instructions on how to apply its statutory election provisions. It includes a "Reasons to Reject an Absentee Ballot" section. Ohio could include instructions explaining the steps that officials should take to positively identify voters before determining that an identification envelope is sufficient or insufficient. Instead, the legislature enacted a measure that forces elections boards to reject some identifiable ballots. We cannot find that Ohio's stated interests outweigh the burden that the field-perfection requirement places on absentee voters.

*Limit on Poll-Worker Assistance.* The burden imposed by demarcating the types of assistance that election officials may render voters is minimal. In most cases, poll-worker assistance will not fix the errors that result in the rejection of absentee and provisional ballots. As discussed, most rejected provisional ballots were not counted because the applicant was not registered at all or tried to vote in a precinct where her or she was not registered. Domestic civilian absentee ballots were usually rejected just for being submitted late—sixty-three percent of rejected ballots in 2014 and over eighty percent in 2015. All voting requirements inevitably encumber some people more than others. Yet Ohio specifically ensures that voters at the greatest risk of making mistakes in marking their ballots—blind, disabled, and illiterate individuals— receive help if it is requested. The onus is on the voter to make the request, but that hardly impinges the right to vote. Any burden is borne only by those who can but do not ask for help or make easily avoidable errors in marking their ballots.

Ohio's legitimate interest in minimizing election-official mistakes by ensuring that they are not overburdened and do not fill in others' personal information justifies the limitation placed on poll-worker assistance.[12] Because Ohio asserts a legitimate interest, this minimally burdensome regulation does not amount to an unconstitutional abridgment of the right to vote.

---

[12]Although not argued by Ohio on appeal, states have an important interest in managing poll-workers' interaction with voters to protect ballot secrecy and prevent coercion. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 206 (1992) (plurality opinion) ("[A]ll 50 States, together with numerous other Western democracies . . . [have] a secret ballot secured in part by a restricted zone around the voting compartments," which "demonstrates that some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud.").

*Cure-Period Reduction.* As discussed, on the basis of the record, reducing from ten to seven the number of days for correcting absentee-ballot errors and presenting provisional-ballot identification imposes a trivial burden on Ohio voters. There is no evidence of the magnitude of the burden and at least one board official testified that few voters even used the final three cure-period days.

That minimal burden on voting is easily outweighed by Ohio's interest in reducing the administrative strain felt by boards of elections before they begin to canvass election returns. The official canvass must begin eleven to fifteen days after Election Day. Ohio Rev. Code. § 3505.32(A). The possibility of unforeseeable post-election issues thrust upon boards is a legitimate concern. Building in a three-day buffer between the cure period and the official canvass is a common-sense solution. Although, as the district court noted, none of the board officials who testified indicated that the ten-day cure period inconvenienced them, a state certainly need not wait for an election issue to arise before enacting provisions to avoid it. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986). Federal law does require that voting equipment give voters the opportunity to correct errors before their ballots are cast and counted. *See* 52 U.S.C. § 21081(a)(1)(A)(ii) (Supp. II Vol. III 2015). But no case mandates any particular length of time that states must provide after Election Day for voters to cure ballot errors. Given the negligible impact of the cure-period reduction on voters, Ohio's reasonable response to a foreseeable problem is not an undue burden.

**B. Lack of Uniform Standards**

A plaintiff may state an equal-protection claim by alleging that lack of statewide standards results in a system that deprives citizens of the right to vote based on where they live. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477–78 (6th Cir. 2008). The district court rejected the plaintiffs' argument that the boards of elections used different standards in the two most recent general elections for determining whether to reject absentee and provisional ballots that contained errors or omissions. We agree.

The plaintiffs presented uncontested evidence that, in determining whether to reject a given ballot, the practices of boards of elections can vary, and sometimes considerably. But that

does not address the central question in a lack-of-uniform standards claim: whether Ohio lacks "adequate statewide standards for determining what is a legal vote." *Bush v. Gore*, 531 U.S. 98, 110 (2000) (per curiam). Arguable differences in how elections boards apply uniform statewide standards to the innumerable permutations of ballot irregularities, although perhaps unfortunate, are to be expected, just as judges in sentencing-guidelines cases apply uniform standards with arguably different results. In fact, that flexibility is part and parcel of the right of "local entities, in the exercise of their expertise, [to] develop different systems for implementing elections." *Id.* at 109. Despite differences in the local application of provisions concerning ballot rejection, the elections boards are guided by clear prescriptive statewide rules that apply equally to all voters. Nor is there any indication that certain categories of provisional or absentee ballots received "preferential treatment." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012); *see also Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 236 (6th Cir. 2011). Thus, the district court correctly concluded that the plaintiffs did not prove arbitrary treatment.

## C. Intentional Discrimination

Facially neutral laws can be motivated by invidious racial discrimination. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). Because of the possibility that discriminatory intent is an underlying motivation, courts must undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Ibid.* Challengers need to show only that discriminatory purpose was "a motivating factor," not necessarily the law's "dominant" or "primary" purpose. *Id.* at 265–66.

In *Arlington Heights*, the Supreme Court articulated nonexhaustive evidentiary factors to consider in determining whether official action was undertaken with a discriminatory purpose. Those factors include:

> "[T]he historical background of the decision, . . . particularly if it reveals a series of official actions taken for invidious purposes"; "the specific sequence of events leading up [to] the challenged decision"; "departures from the normal procedural sequence"; "substantive departures, . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"; and the "legislative or administrative history, . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."

*Spurlock v. Fox*, 716 F.3d 383, 397 (6th Cir. 2013) (quoting *Arlington Heights*, 429 U.S. at 267–68) (alterations omitted).

The record does not reveal that SB 205 and SB 216 were enacted with discriminatory intent. As discussed, the evidence does not demonstrate that minority voters are disproportionately affected by the provisions. Nor did the legislature depart from normal procedural practices when it considered the provisions for several months before their passage. *Cf. N.C. State Conference of the NAACP v. McCrory*, ___ F.3d ___, Nos. 16-1468, 16-1469, 16-1474, 16-1529, 2016 WL 4053033, at *13 (4th Cir. July 29, 2016) (law passed with discriminatory intent in part due to legislature's "eagerness," after *Shelby County* held unconstitutional Section 5's preclearance requirement, to "rush through the legislative process the most restrictive voting law North Carolina has seen since the era of Jim Crow"). In fact, the basic contours of SB 205 originally appeared in a report of the bipartisan OAEO.

A racially tinged statement by one legislator who allegedly asked during committee debate whether the General Assembly "should . . . be making it easier for those people who take the bus after church on Sunday to vote" is troubling. *Cf. Ohio State Conference*, 768 F.3d at 539 ("African Americans have come to rely on Sunday voting through 'Souls to the Polls initiatives,' in which churches have leveraged the transportation they already provide to and from church to bring voters to EIP voting locations."). But we agree with the district court that on the whole, the record does not show that the General Assembly acted with racial animus.

## VI.  Due Process

The Due Process Clause is implicated in "exceptional" cases where a state's voting system is "fundamentally unfair." *Warf v. Bd. of Elections*, 619 F.3d 553, 559 (6th Cir. 2010) (quoting *League of Women Voters of Ohio*, 548 F.3d at 478). Fundamental unfairness may occur, for example, if a state uses non-uniform procedures that result in significant disenfranchisement and vote dilution. *See League of Women Voters of Ohio*, 548 F.3d at 478. "[G]arden variety election irregularities," however, do not prove fundamental unfairness. *Griffin v. Burns*, 570 F.2d 1065, 1076, 1078–79 (1st Cir. 1978). The district court rejected the plaintiffs' fundamental-unfairness claim, and we affirm.

As discussed in response to the argument that Ohio's voting system lacks uniform standards, discrepancies at the margins in how local boards of elections apply statewide provisions is not unusual. Those predictable divergences impact a small number of voters and do not amount to a fundamentally unfair voting system. Nor do the technical-perfection requirements that SB 205 and SB 216 impose on absentee and provisional voters rise to an exceptional level of unfairness comparable to grossly non-uniform procedure or significant voter disenfranchisement.

We also find unconvincing the appellees' contention that the district court denied their procedural-due-process claim "without addressing its merits." Second Br. 75. The district court clearly held that the alleged harm was "caused by the portions of SB[] 205 and SB 216 that impose a completion requirement for the five fields, not the *lack* of process given when a ballot is rejected." *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *43 (S.D. Ohio June 7, 2016) (emphasis added). We therefore dismiss this claim.

## VII.  Conclusion

We AFFIRM the entry of judgment for the plaintiffs on their equal-protection undue-burden claim as it relates to the requirement that boards of elections reject mail-in and in-person absentee ballots for failure to complete the identification envelope's address and birthdate fields with technical precision. Therefore, we AFFIRM its permanent injunction of the portions of SB 205 that amend Sections 3509.06(D) and 3509.07 of the Ohio Revised Code. *See* S.B. 205, 130th Gen. Assemb. (Ohio 2014), at 9–12.

To be perfectly clear, this remaining injunction does not impede the legitimate interests of Ohio election law. The versions of Sections 3509.06(D) and 3509.07 that existed before the enactment of SB 205 (and that the injunction effectively reinstates) were altogether serviceable. Nothing in our opinion prevents election officials from rejecting absentee ballots whose identification envelopes contain "insufficient" information. Ohio Rev. Code. § 3509.07 (2013). The Secretary can and should continue to instruct the boards of elections on implementing those provisions in order to further the interest of uniformity and to provide guidance on the steps boards should take to identify absentee voters before deeming an identification envelope

"insufficient." And, within the bounds of the Fourteenth Amendment, the General Assembly has authority to modify its elections laws in the future. But in doing so, it must act to further important State interests if its proposed changes burden Ohioans' right to vote.

We deeply respect the dissent's recounting of important parts of the racial history of our country and the struggle for voting rights, and we agree that this history may always be appropriately borne in mind. However, that history does not without more determine the outcome of today's litigation over voting practices and methods. The legal standards we must follow are set out in the cases we discuss concerning the standards embodied in the Fourteenth Amendment and Section 2 of the Voting Rights Act. With respect to the dissent's discussion regarding factual findings, this opinion does not quarrel with the district court over its recitation of the record or of any credibility determinations made by the district court. Rather, our holding is that the district court's legal conclusions from that record are in certain parts erroneous, as set forth in this opinion, and in light of other parts of the record that the court did not consider.

For reasons stated, we REVERSE the judgment of the district court on the remaining undue-burden claims and the VRA Section 2 claims. We AFFIRM the entry of judgment for Ohio on all other claims.

———————————

**DISSENT**

———————————

DAMON J. KEITH, concurring in part, dissenting in part.  Democracies die behind closed doors. *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002).  By denying the most vulnerable the right to vote, the Majority shuts minorities out of our political process. Rather than honor the men and women whose murdered lives opened the doors of our democracy and secured our right to vote, the Majority has abandoned this court's standard of review in order to conceal the votes of the most defenseless behind the dangerous veneers of factual findings lacking support and legal standards lacking precedent.  I am deeply saddened and distraught by the court's deliberate decision to reverse the progress of history.  I dissent.

In 2014, Ohio enacted Senate Bills 205 and 216, which (1) required county elections boards to reject the ballots of absentee and provisional voters whose identification envelopes or affirmation forms, respectively, contained an address or birthdate that did not exactly match voting records; (2) reduced the number of post-election days for absentee voters to cure identification-envelope errors, and the number of days for provisional voters to present valid identification, from ten days to seven days; and (3) restricted the ways in which poll workers can help in-person voters.  After conducting a twelve-day trial and authoring a 112-page opinion brimming with sound factual findings and legal conclusions, the district court (Judge Algenon L. Marbley) justly held that all of the challenged provisions imposed an undue burden on the right to vote and violated plaintiffs' equal protection rights.

In complete abandonment of the clearly erroneous standard of review, the Majority displaces several of the district court's well-reasoned and supported factual findings.  The Majority's decision to gut the factual findings of the district court and to advance legal standards without precedent in order to shut the most vulnerable out of the political process must be subjected to the natural antiseptic of sunlight.  The unfettered right to vote is the bedrock of a free and democratic society—without it, such a society cannot stand.  This right is fundamental. It is the most valuable right a person possesses, because without it, all other rights are meaningless.  As history has shown time and time again, laymen and jurists alike have actively

worked to deny the right to vote to minorities, in both obvious and obscure ways. The Voting Rights Act ("VRA"),[1] sought to right this wrong by allowing all citizens—unrestrained—to exercise their right to vote regardless of race. While the VRA and Equal Protection Clause sought to bring this nation forward, closer to a society free of racial discrimination, today the Majority's opinion takes us several steps back. Because the Majority has completely ignored the applicable standard of review and has instead engaged in its own fact finding and reweighing of the evidence in complete disregard for the clearly erroneous standard of review, because the Majority has created a legal standard in contradiction to existing case law based on a concurring opinion and dictum, and because the Majority has dishonored the struggle for the right of the most vulnerable to vote, I dissent. I would instead affirm the district court in full.

## BACKGROUND

### A. Historical Background

#### 1. The Martyrdom and Struggle for Equal Protection

The Majority's actions must be viewed in full light of their historical context. The murders of countless men and women who struggled for the right to vote and equal protection cannot be overlooked. The utter brutality of white supremacy in its efforts to disenfranchise persons of color is the foundation for the tragedy that is the Majority's effort to roll back the progress of history. I will not forget. I cannot forget—indeed America cannot forget—the pain, suffering, and sorrow of those who died for equal protection and for this precious right to vote. I add the following publicly available historical statements to humanize the struggle for the right to be equal participants in the democratic process. While the Majority aptly notes that these historical statements do not dictate the outcome of this case, it is imperative that we assess the efforts to undermine the right to vote as an historical operative that did not begin with the Majority's opinion and unfortunately will not end with it.[2]

---

[1]52 U.S.C.A. § 10301 *et seq.*

[2]I give full context to the legal analysis of the issues presented in this case as well as full historical contextualization of the facts. The following pictures and synopses cannot capture the full horror of those who lost their lives in the quest for equal protection and voting rights. The following is a mere fraction of the martyrs of the struggle for equality. The assaults, rapes, murders, lynching, and utter travesty of the struggle for equality can never

| | |
|---|---|
|  | In 1955, **Reverend George Lee**, an African American Baptist minister who had the temerity to found a local NAACP chapter in Humphreys County, Mississippi, urged his congregation to vote. While the cause of his death is disputed, there is substantial evidence that he was murdered for his efforts.[3] |
|  | In 1955, **Lamar Smith** was shot dead on the courthouse lawn by a white man in broad daylight while dozens of people watched.[4] The killer was never indicted. Smith had organized blacks to vote in a recent election.[5] |

---

be fully captured in words or pictures. The Southern Poverty Law Center sustains a memorial for these individuals, and much of the following information can be found on their website: https://www.splcenter.org/what-we-do/civil-rights-memorial/civil-rights-martyrs (last visited September 12, 2016).

[3]*See* K.C. Meckfessel Taylor, Marielle Elisabet Dirkx, William Mcintosh, W. Tucker & Carrington, CSI Mississippi: *The Cautionary Tale of Mississippi's Medico-Legal History*, 82 Miss. L.J. 1271, 1272 (2013).

[4]Paula C. Johnson, *Voting Rights and Civil Rights Era Cold Cases: Section Five and the Five Cities Project*, 17 Berkeley J. Afr.-Am. L. & Pol'y 377, 384 (2015).

[5]*Id.*



In 1955, **Emmett Louis Till**, a 14-year-old boy on vacation, reportedly flirted with a white woman in a store.[6] Three nights later, two men took Till from his bed, beat him, shot him and dumped his body in the Tallahatchie River. One of Till's murderers reflected, "I just decided it was time a few people got put on notice. As long as I live and can do anything about it, niggers are gonna stay in their place. Niggers ain't gonna vote where I live."[7] An all-white jury declared the men innocent of murder.[8]



In 1957, **Willie Edwards Jr**. was assaulted by several Klansmen who threatened to castrate him, took him to a bridge, and forced him to jump,[9] all for allegedly making advances toward a white woman.[10]

---

[6]Ronald Turner, *Remembering Emmett Till*, 38 How. L.J. 411, 415 (1995).

[7]*Id*. at 417 (citing William Bradford Huie, *The Shocking Story of Approved Killing in Mississippi*, Look, Jan. 24, 1956, at 50).

[8]*Id*. at 419.

[9]Adam Nossiter, *Murder, Memory And the Klan; A Special Report: Widow Inherits a Confession To a 36-Year-Old Hate Crime*, N.Y. Times, Sept. 4, 1993, at 1, *available at* http://www.nytimes.com/1993/09/04/us/murder-memory-klan-special-report-widow-inherits-confession-36-year-old-hate.html?pagewanted=all (last visited September 6, 2016).

[10]Anthony V. Alfieri, *Retrying Race*, 101 Mich. L. Rev. 1141, 1163 (2003).



In 1959, **Mack Charles Parker**, 23, was accused of raping a white woman.[11] Three days before his case was set for trial, a masked mob took him from his jail cell, beat him, shot him, and threw him in the Pearl River.[12]



In 1961, **Herbert Lee**, who worked to register black voters, was killed by a state legislator who claimed self-defense and was never arrested.[13] Louis Allen, a black man who witnessed the murder, was later also killed.[14]

---

[11] Anders Walker, *The Violent Bear It Away: Emmett Till and the Modernization of Law Enforcement in Mississippi*, 46 San Diego L. Rev. 459, 492-93 (2009); *see also* Jack Greenberg, *Brown v. Board of Education: An Axe in the Frozen Sea of Racism*, 48 St. Louis U. L.J. 869, 877 (2004) (citing Jack Greenberg, <u>Crusaders in the Courts: How a Dedicated Band of Lawyers Fought for the Civil Rights Revolution</u> (1994)).

[12] *Walker*, 46 San Diego L. Rev. at 493.

[13] Paula C. Johnson, *Voting Rights and Civil Rights Era Cold Cases: Section Five and the Five Cities Project*, 17 Berkeley J. Afr.-Am. L. & Pol'y 377, 384 (2015).

[14] *Id.*

| | |
|---|---|
|  | In 1962, **Cpl. Roman Ducksworth Jr.**, a military police officer stationed in Maryland, was on leave to visit his sick wife when he was ordered off a bus by a police officer and shot dead.[15] The police officer may have mistaken Ducksworth for a "freedom rider" who was testing bus desegregation laws.[16] |
|  | In 1962, **Paul Guihard**, a reporter for a French news service, was killed by gunfire from a white mob during protests over the admission of James Meredith to the University of Mississippi.[17] |
|  | In 1963, **William Lewis Moore**, a postman from Baltimore, was shot and killed during a one-man march against segregation.[18] Moore had planned to deliver a letter to the governor of Mississippi urging an end to intolerance.[19] |

---

[15]*Id.* at 387.

[16]*Id.*

[17]Mitchell F. Crusto, *The Supreme Court's "New" Federalism: An Anti-Rights Agenda?*, 16 Ga. St. U. L. Rev. 517, 572 (2000) (citations omitted).

[18]Miles Johnson, A Postman's 1963 Walk For Justice, Cut Short On An Alabama Road, NPR, April 14, 2013, *available at*  http://www.npr.org/2013/08/14/211711898/a-postmans-1963-walk-for-justice-cut-short-on-an-alabama-road (last visited September 6, 2016).

[19]*Id.*

| | |
|---|---|
|  | In 1963, **Medgar Evers**, who directed NAACP operations in Mississippi, was leading a campaign for integration in Jackson when he was shot and killed by a sniper at his home.[20] |
|  | In 1963, **Addie Mae Collins, Denise McNair, Carole Robertson, and Cynthia Wesley** were getting ready for church services when a bomb exploded at the Sixteenth Street Baptist Church in Birmingham, Alabama, killing all four of the school-aged girls.[21] The church had been a center for civil rights meetings and marches.[22] |
|  | In 1963, on the same day as the bombing killing four girls, **Virgil Lamar Ware**, 13, was riding on the handlebars of his brother's bicycle when white teenagers fatally shot him.[23] The white youths had come from a segregationist rally held in the aftermath of the Sixteenth Street Baptist Church bombing.[24] |

---

[20]Margaret M. Russell, *Cleansing Moments and Retrospective Justice*, 101 Mich. L. Rev. 1225, 1236 (2003).

[21]Donald Q. Cochran, *Ghosts of Alabama: The Prosecution of Bobby Frank Cherry for the Bombing of the Sixteenth Street Baptist Church*, 12 Mich. J. Race & L. 1 (2006).

[22]*Id.*

[23]Tim Padgett and Frank Sikora, The Legacy of Virgil Ware, Time Magazine, Sept. 22, 2003, *available at* http://content.time.com/time/magazine/article/0,9171,485698,00.html (last visited September 6, 2016).

[24]*Id.*

| | |
|---|---|
|  | In 1964, **Louis Allen**, who witnessed the murder of civil rights worker Herbert Lee, endured years of threats, jailings, and harassment in Mississippi. [25] He was making final arrangements to move north on the day he was killed.[26] |
|  | In 1964, **Rev. Bruce Klunder** was among the civil rights activists who protested the building of a segregated school. Klunder was crushed to death when a bulldozer backed over him.[27] |
|  | In 1964, **Henry Hezekiah Dee** and **Charles Eddie Moore** were killed by Klansmen who believed the two were part of a plot to arm blacks in the area.[28] Their bodies were found during a massive search for the missing civil rights workers Chaney, Goodman, and Schwerner, listed immediately below.[29] |

---

[25] Anthony Hall, *A Stand for Justice-Examining Why Stand Your Ground Laws Negatively Impact African Americans*, 7 S. Region Black L. Students Ass'n L.J. 95, 112 (2013) (citation omitted).

[26] *Id.*

[27] William D. Henderson, *Demography and Desegregation in the Cleveland Public Schools: Toward A Comprehensive Theory of Educational Failure and Success*, 26 N.Y.U. Rev. L. & Soc. Change 457, 557 (2001) (citing Paul Shepard, *A Martyr Remembered: 30 Years Ago, Rights Activist Bruce Klunder Died Beneath a Bulldozer Here*, Plain Dealer (Cleveland), Apr. 7, 1994, at A1).

[28] Janis L. McDonald, *Heroes or Spoilers? The Role of the Media in the Prosecutions of Unsolved Civil Rights Era Murders*, 34 Ohio N.U. L. Rev. 797, 817, 826 (2008) (citation omitted).

[29] *Id.*

| | |
|---|---|
|  | In 1964, **James Earl Chaney, Andrew Goodman, and Michael Henry Schwerner,** young civil rights workers, were arrested by a deputy sheriff and then released into the hands of Klansmen who had plotted their murders.[30] They were shot, and their bodies were buried in an earthen dam.[31] |
|  | In 1964, **Lt. Col. Lemuel Penn**, a Washington, D.C., educator, was driving to D.C. from Georgia when he was shot and killed by Klansmen in a passing car.[32] |
|  | In 1965, **Jimmie Lee Jackson** was beaten and shot by state troopers as he tried to protect his grandfather and mother from a trooper attack on civil rights marchers.[33] His death led to the voting rights march and the eventual passage of the Voting Rights Act.[34] |

---

[30] Paula C. Johnson, *Voting Rights and Civil Rights Era Cold Cases: Section Five and the Five Cities Project*, 17 Berkeley J. Afr.-Am. L. & Pol'y 377, 384 (2015).

[31] *Id.*

[32] Michal R. Belknap, *The Vindication of Burke Marshall: The Southern Legal System and the Anti-Civil-Rights Violence of the 1960s*, 33 Emory L.J. 93, 102-03, 129, 132 (1984).

[33] Paula C. Johnson, *Voting Rights and Civil Rights Era Cold Cases: Section Five and the Five Cities Project*, 17 Berkeley J. Afr.-Am. L. & Pol'y 377, 386 (2015).

[34] *See id.* at 386-89.

| | |
|---|---|
|  | In 1965, **Rev. James Reeb**, a Unitarian minister from Boston, was one of many white clergymen who joined the Selma marchers after state troopers attacked protestors at the the Edmund Pettus Bridge.[35] Reeb was beaten to death by white men while he walked down a Selma street.[36] |
|  | In 1965, **Viola Gregg Liuzzo**, a housewife and mother from Detroit, drove alone to Alabama to help with a voting rights march in Selma.[37] She was ferrying marchers between Selma and Montgomery when she was shot and killed by a Klansmen in a passing car.[38] |
|  | In 1965, **Oneal Moore** was the first black deputy sheriff for the Washington Parish Sheriff's Office in Varnado, Louisiana.[39] Moore was killed while on patrol. Mississippi police arrested Klansman Ray McElveen. Louisiana prosecutors extradited McElveen and indicted him for murder but released him within weeks for insufficient evidence and dropped all charges.[40] |

---

[35] *Id.* at 384.

[36] *Id.*

[37] *Id.* at 384.

[38] *Id.*

[39] Anthony V. Alfieri, *Retrying Race*, 101 Mich. L. Rev. 1141, 1164 (2003).

[40] *Id.*

| | |
|---|---|
|  | In 1966, **Samuel Leamon Younge Jr.**, a student civil rights activist, was fatally shot by a white gas station owner following an argument over segregated restrooms.[41] |
|  | In 1966, **Vernon Ferdinand Dahmer**, a wealthy black businessman, offered to pay poll taxes for those who could not afford the fee required to vote.[42] The night after a radio station broadcasted Dahmer's offer, his home was firebombed.[43] Dahmer died later from severe burns after holding off the Klansmen with his shotgun long enough for his family to escape.[44] |

---

[41]David J. Krajicek, *Black Man Killed For Trying To Use Whites-Only Bathroom In Alabama In 1966 Set Off Protests That Echo Today, Daily News,* May 21, 2016, available at http://www.nydailynews.com/news/national/black-man-killed-bathroom-alabama-1966-article-1.2645287 (last visited September 6, 2016).

[42]Joseph W. Gill, *Mississippi Justice at Last: The Trials and Convictions of Beckwith, Bowers and Killen,* Prosecutor, July/August 2007, at 26, 28.

[43]*Id.*

[44]*Id.*



In 1966, **Ben Chester White**, a sixty-seven year old black man, was murdered by three members of the Klan who wanted to lure Reverend Martin Luther King, Jr. to the Natchez, Mississippi area.[45] An all white male jury acquitted one of his killers.[46]



In 1967, **Wharlest Jackson**, the treasurer of his local NAACP chapter, was one of many blacks who received threatening Klan notices at his job.[47] After Jackson was promoted to a position previously reserved for whites, a bomb was planted in his car.[48] It exploded minutes after he left work one day, killing him instantly.[49]

---

[45]Janis L. McDonald, *Heroes or Spoilers? The Role of the Media in the Prosecutions of Unsolved Civil Rights Era Murders*, 34 Ohio N.U. L. Rev. 797, 809 (2008).

[46]*Id.*

[47]Paula C. Johnson, *Voting Rights and Civil Rights Era Cold Cases: Section Five and the Five Cities Project*, 17 Berkeley J. Afr.-Am. L. & Pol'y 377, 384 (2015).

[48]*Id.*

[49]*Id.*

| | |
|---|---|
|  | In 1967, **Benjamin Brown**, a former civil rights organizer, was at a protest when he was hit by stray gunshots from police who fired into the crowd.[50] |
|  | In 1968, **Samuel Ephesians Hammond Jr., Delano Herman Middleton, and Henry Ezekial Smith** were shot and killed by police who fired on student demonstrators at the South Carolina State College campus.[51] |
|  | In 1968, **Dr. Martin Luther King Jr.**, a Baptist minister, was a major architect of the Civil Rights Movement.[52] He was assassinated as he prepared to lead a demonstration in Memphis.[53] |

---

[50]Anders Walker, *The Violent Bear It Away: Emmett Till and the Modernization of Law Enforcement in Mississippi*, 46 San Diego L. Rev. 459, 499 (2009).

[51]Bass, J. (n.d.). The Orangeburg Massacre, available at http://www.jackbass.com/_u_the_orangeburg_massacre__u__25512.htm (last visited September 6, 2016).

[52]Henry J. Richardson III, *From Birmingham's Jail to Beyond the Riverside Church: Martin Luther King's Global Authority*, 59 How. L.J. 169, 171 (2015).

[53]*Id.*

### 2. The Election of the United States' First Black President

Another important historical occurrence that cannot be separated from efforts to abridge minorities' right to vote is the election of the United States' First Black President. On February 10, 2007, then-Senator Barack Obama of Illinois, an African American, announced his candidacy for the United States Presidency.[54] On November 4, 2008, President Obama became the first African-American President of the United States. President Obama not only captured the presidency, but under his leadership, the Democratic party gained control of the House, the Senate and the White House for the first time since 1995.[55] On April 4, 2011, President Obama announced his reelection for the presidency.[56] On November 6, 2012, President Obama was re-elected President of the United States.[57]

### B. Factual Background

#### 1. The Parties[58]

Plaintiff, "The Northeast Ohio Coalition for the Homeless" ("NEOCH"), advocates on behalf of the Cleveland homeless, airing and addressing issues related to their lack of housing, employment, and health care. About seventy percent of NEOCH's in-person homeless applicants are African American. Promoting voting among its members, and among the homeless county-wide, is central to NEOCH's mission, and NEOCH's executive director, staff, and volunteers expend substantial resources on voting activities in even-numbered years. Executor Director Brian Davis "spends as much as 80 hours per week around the voting

---

[54] Adam Nagourney & Jeff Zeleny, *Obama Formally Enters Presidential Race*, New York Times, Feb. 11, 2007.

[55] *Id.*

[56] Chris Cillizza & Emi Kolawole, *President Obama Announces Reelection Bid*, Washington Post, April 4, 2011.

[57] David A. Fahrenthold, *Obama Reelected As President*, Washington Post, November 7, 2012.

[58] The following facts are taken from the district court opinion. *Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *1 (S.D. Ohio June 7, 2016). As stated *infra*, the Majority has failed to establish that any of the district court's factual findings are clearly erroneous. By way of reference, I incorporate all of the district court's factual findings in this dissent. I have highlighted many of those findings here; however, I direct attention in particular to the district court's finding regarding the Senate Factors, which I also incorporate herein. *Husted*, 2016 WL 3166251, at *24-32.

registration deadline on such activities, and one part-time NEOCH staff person devotes 20 hours per week to early voting turnout efforts." Because of the challenged laws, NEOCH would "no longer provide blank cards to its members to vote by mail, but will instead focus [on] . . . driving people to the polls to vote, which will divert drivers and vehicles from doing other work on behalf of the organization . . . ." This will also require more financial resources.

In describing the impact of the loss of voting to the NEOCH constituency, the district court made the following findings of fact:

> Were NEOCH's members unable to vote, their bargaining power vis-à-vis elected officials would be diminished, which would in turn diminish NEOCH's effectiveness at advocating on their behalf, frustrating its mission and exposing an already vulnerable population to further governmental neglect. The homeless constituents of NEOCH and CCH face challenges that hinder them from asserting their own rights, including mental illness and/or addiction, difficulty maintaining a regular address or phone number, limited access to transportation, and illiteracy or lack of education. They also find it challenging to gain entrance to courtrooms and public buildings due to lack of ID, and many homeless people have a negative relationship with the judicial system or hesitate to get involved in litigation to assert their rights because they are more focused on meeting their immediate needs.

*Husted*, 2016 WL 3166251, at *7 (citations omitted).

Of the NEOCH homeless members who have voted in primary elections, about eight vote in the Democratic primary for each one who votes in the Republican primary. *Id.* In describing the impact of SB 205 and SB 216, the district court made the following findings of fact:

> [E]ight to ten percent of those living in shelters across Cuyahoga County are absolutely illiterate, and the majority read at only a fourth-grade level. Davis feared that the complexity of the form, along with SB 205's provisions demanding that voters fill out the required fields completely and accurately . . . increased the risk of NEOCH's members being disenfranchised. In his twenty years working with the homeless, Davis has noticed that homeless persons have pervasive and profound problems filling out the forms. Not being able to read or fill out forms correctly is embarrassing and humiliating for many of NEOCH's members, and they hesitate to ask for help. NEOCH's practice with other government forms, such as those relating to Social Security disability and Medicaid benefits, is to read the forms aloud and fill them out on the homeless person's behalf as a matter of course.

*Husted*, 2016 WL 3166251, at *7 (citations omitted).

Plaintiff, Columbus Coalition for the Homeless ("CCH"), advocates for homeless people in Columbus. Sixty percent of homeless people in shelters in Columbus are African American. Because of the challenged laws, CCH will explain new voting requirements to homeless persons at meetings, publishing articles about the requirements, and train its members to educate other homeless persons.

Plaintiff, Ohio Democratic Party ("ODP"), is a political party consisting of 1.2 million members; it seeks to advance the interests of the Democratic Party.[59]

Defendant Secretary of the State of Ohio functions as Ohio's chief election officer. Ohio Rev. Code §§ 3501.04, 3501.05. The State of Ohio is an Intervenor.

### 2. Voting in Ohio

**Absentee Voting.** Since 2006, all registered voters have the option to vote absentee without any excuse. To receive an absentee ballot, a voter must provide to the Board of the county in which he or she will vote an application consisting of: (1) the voter's driver's license number; (2) the voter's last four digits of their social security number ("SSN-4"); and (3) an approved form of identification. If these requirements are met, the voter receives an absentee ballot; if these requirements are not met, the voter is notified of the deficiency.

A voter may do "in-person absentee voting"—i.e., vote in-person at their county Board during certain days and hours—or, "mail-in absentee voting." When mailing the form to the Board, the voter must sign and include in the envelope an affirmation declaring the voter is eligible to vote, and if the voter did not provide a driver's license number or SSN-4, the voter must provide an acceptable form of identification or current state or federal documents that show the name and address of the voter. If there is an error in any of the five fields, the Board mails a Form 11-S, specifying the type of error and informing the voter that the ballot will not be counted unless certain steps are taken—namely, returning the Form 11-S by a certain time.

---

[59]The Service Employees International Union ("SEIU") is also a plaintiff in this matter. SEIU joined NEOCH in initiating the original action against the Secretary in 2006.

**Provisional Voting.**  Voters who cannot confirm eligibility—and so cannot cast a regular ballot—can complete a provisional ballot.  This allows the voter to cast provisionally, "subject to later verification."  This type of voting is available to several categories of voters.

### 3.  Challenged Laws

**SB 205 - changes to absentee voting procedures**

SB 205 mandates that an ID envelope is considered incomplete if the voter does not fill out the five fields of required information ("five-fields requirement"):  (1) name; (2) residence address; (3) date of birth; (4) signature; and (5) some form of ID, which includes the types of acceptable ID required for the absentee ballot application form.  If these requirements are not met, the voter will receive a written notice informing them of the nature of the defect and that further information must be provided for the ballot to be counted.  Before enactment of SB 205, the information contained in the five fields was merely requested, not required.  Pursuant to SB 205, if the information is missing, the ballot "shall not be counted."

The information must be provided no later than the seventh day after the election.  This opportunity to cure—i.e., "cure period"—was longer before the enactment of SB 205; voters had ten days rather than seven days to furnish the information.

**SB 216 - changes to provisional voting procedures**

Before enactment of SB 216, voters were required to provide only their names, IDs, and signatures in the provisional ballot affirmation form.  Pursuant to SB 216, provisional voters must also provide the date of birth and current address.  SB 216 also requires voters to print their names on the provisional ballot envelope.  Section 3505.182(F) of the provision already imposed a "completeness requirement."  Section 3505.181(F) provides that persons filling out provisional ballots may receive help, but only if they declare to an election official that they are unable to fill out the ballot due to blindness, disability, or illiteracy.

### 4.  The Lead-Up to SB 205 and SB 216

Following the 2010 election, control of the Ohio House of Representatives switched from the Democratic to the Republican Party.  "Rather quickly" after that change in leadership, House

Republicans introduced two bills:  (1) a bill to require all Ohioans to show a photo ID when voting and (2) House Bill 194 ("HB 194"), an expansive election-law bill that included "a number of restrictions on voting, including the restrictions that we see in [SBs 205 and 216]." Representative Kathleen Clyde, Ohio General Assemblyperson, testified that the debate over HB 194 was "very partisan and hostile" and "very quick."  HB 194 was ready for the Governor's signature within two months of its introduction, which Representative Clyde testified marks a significantly shorter time period than usual for the passage of legislation of such complexity. *Husted*, 2016 WL 3166251, at \*13.

In August 2012, in an unprecedented move, the Ohio legislature voted to repeal HB 194 after hundreds of thousands of Ohioans signed petitions to place it on the ballot for a statewide referendum in November 2012.  Sixteen other bills proposing voting restrictions were introduced in the 2013-2014 General Assembly, eight of which passed.  One bill was passed to shorten the window to gather signatures for referenda, which made it more difficult for citizens to put a referendum on the ballot.  Another bill was passed making it easier to purge voters from the registration rolls.  Senate Bill 238, which eliminated the first week of the early voting period, also was enacted.  Other bills were introduced, but not passed, which would have limited voting in the following ways:  shortening the early voting period to 14 days; eliminating early voting hours; limiting the mailing of absentee ballot applications to voters and preventing the paying of return postage on absentee ballot envelopes; instituting a photo-ID requirement; and requiring state universities to provide in-state tuition rates to students if they provided those students with ID that they needed to vote.

None of the proponents of SB 205 cited voter fraud as a justification for the bill.  *Husted*, 2016 WL 3166251, at \*13.  During the floor debate of SB 205, in contrast to most proposed legislation, there was no data or testimony offered about the need for the measures proposed in SB 205.  *Id.*  During committee debate, Representative Matt Huffman, speaking in favor of SB 205, asked "should we really be making it easier for those people who take the bus after church on Sunday to vote."  *Id.*  With respect to both SB 205 and SB 216, Democratic legislators spoke about their concerns that the provisional and absentee ballots of African-American voters would be thrown out disproportionately.  *Id.* at \*14.

As to the cure period, one Board official testified that before the challenged laws went into effect, voters did come in during the eighth, ninth, and tenth days of the cure period to cure their provisional and absentee ballots. Because the Board can receive absentee ballots up until ten days after Election Day, yet the cure period is only seven days, some voters to whom the Board sends a Form 11-S notifying them of their need to cure their ballot will not receive it in time to do so. *Id.* at *17.

### 5. Information Requirements

The vast majority of NEOCH's individual homeless members plan to participate in the 2016 general election. Many of CCH's members also plan to vote. Many of the organization's members are illiterate, barely literate, and/or mentally ill. A CHH witness testified that without assistance, a homeless person could not complete the entire form and that due to the complexity and amount of print on the form, some homeless people would just tear it up and say, "you know, to hell with it." Forms that are, in the words of one Board official, "pretty complex," with "a lot of wording, a lot of stuff crammed into" them, can confuse even educated, literate voters.

### 6. Prohibition Against Poll-Worker Assistance

The district court found that the prohibition against poll-worker assistance burdens persons with low literacy, particularly if they are embarrassed to reveal their illiteracy due to the stigma it entails. Plaintiffs introduced ample evidence that many of their members fall into this category and that illiteracy or low literacy levels are prevalent among the homeless. Homeless voters suffer disproportionately from disabilities, including mental illness, which can also hamper their ability to fill out forms. About a third of the homeless individuals with whom NEOCH works have a mental disability, forty-five to fifty percent read at a fourth-grade level, and eight to ten percent are completely illiterate. They may write poorly and have handwriting that is difficult to read or, due to mental illness, they struggle to focus on basic tasks without help. All of these issues combine to create difficulties for homeless voters in filling out forms without assistance like the absentee ID envelope and the provisional ballot affirmation. Moreover, NEOCH Executive Director Brian Davis testified that in his experience with voter mobilization of homeless people in 2014, Board staff members were more hesitant to engage

with voters and offer help when it appeared to be necessary and that homeless voters have been more likely to make mistakes because of the lack of help. Secretary Husted failed to conduct any review or testing of the effect of the provisional ballot affirmation or the absentee identification envelope on voters with low literacy, despite a suggestion to do so from the League of Women Voters. In sum, the district court concluded that many homeless people face vexing and profound obstacles in exercising the basic right to vote, and the prohibition against poll-worker assistance is likely to exacerbate the problem.

## ANALYSIS

### A. The Majority Applies the Wrong Standard of Review for Factual Findings

By applying the wrong standard of review, the Majority abandons its role as a court of appellate review and plays the role of the trier of fact. I cannot join this flawed approach.

"On an appeal from a judgment entered after a bench trial, [this court] review[s] the district court's . . . conclusions of law de novo." *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005). "Mixed questions of law and fact are also subject to de novo review." *T. Marzetti Co. v. Roskam Baking Co.*, 680 F.3d 629, 633 (6th Cir. 2012) (citing *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 358 (6th Cir. 2007)). A district court's findings of fact are reviewed for clear error. *Lindstrom*, 424 F.3d at 492. "A finding of fact will only be clearly erroneous when, although there may be some evidence to support the finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Roskam Baking Co.*, 680 F.3d at 633 (quoting *United States v. Darwich*, 337 F.3d 645, 663 (6th Cir. 2003)). "If the district court's account of the evidence is plausible in light of the entire record, this court may not reverse that accounting, even if convinced that, had it been sitting as trier of fact, it would have weighed the evidence differently." *Id.* (quoting *Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767, 771 (6th Cir. 2007)). "This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

"In reviewing factual findings for clear error, 'the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.'" *Calloway v. Caraco Pharm. Labs., Ltd.*, 800 F.3d 244, 251 (6th Cir. 2015) (quoting Fed. R. Civ. P. 52(a)(6)). "[This court] cannot find that the district court committed clear error where there are two permissible views of the evidence, even if we would have weighed the evidence differently." *Id.* (quoting *King v. Zamiara*, 680 F.3d 686, 694 (6th Cir. 2012)).

Here, the district court took great lengths to make well reasoned and supported factual findings. Indeed, the district court's findings of facts were the product of *several years of litigation* and a *twelve-day bench trial*. The findings alone span over fifty pages in length. The findings are supported by statistical, empirical, and testimonial evidence after research was conducted regarding thousands of voters over several years of voting cycles. These findings of fact are critical to analyzing the claims brought pursuant to the Voting Rights Act and the Equal Protection Clause. Some of the most relevant findings of the district court are as follows:

- Across all even-numbered election years, minorities use provisional ballots more often than whites, and in presidential election years, the absentee ballots and provisional ballots of minority voters are more likely to be rejected than those of white voters.
- African-Americans were hindered from participating in the political process.
- Ohio has a history of racially discriminating voting laws.
- Racially polarized voting in Ohio is extensive.
- There are racialized appeals in politics.
- African-Americans are still not represented well in the most important and visible elected statewide posts.
- There is a lack of responsiveness to the particularized needs of African-American voters.

Yet, the Majority largely ignores these findings and instead applies a de novo standard of review. While the Majority asserts that it is not applying a de novo standard of review, careful review of the Majority opinion reveals that it indeed does. For instance, the Majority took note of the district court's conclusion that "African-American voters are more likely than white voters to have their absentee or provisional ballots rejected." "A district court's conclusion that a challenged electoral practice has discriminatory effect is a question of fact subject to review for

clear error." *Ortiz v. City of Philadelphia Office of City Com'rs Voter Registration*, 28 F.3d 306, 308-09 (3rd Cir. 1994) (citing *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986)). Yet, the Majority disagreed with this factual finding merely because it sees the record differently. The Majority fails to demonstrate (or even assert) that the district court's factual findings are not "plausible in light of the entire record." *See Roskam Baking Co.*, 680 F.3d at 633 ("If the district court's account of the evidence is *plausible in light of the entire record, this court may not reverse* that accounting, even if convinced that, had it been sitting as trier of fact, it would have weighed the evidence differently.") (emphasis added). The Majority did exactly what the Supreme Court has repeatedly said we cannot do, "reverse the finding of the trier of fact simply because it . . . would have decided the case differently." *See Anderson*, 470 U.S. at 573. The clear error standard of review "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Id.* We must be mindful that because we are a court of appellate review, we do not decide factual issues de novo. *See id.* "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[60] *Id.* at 574.

Because the standard of review is the lens through which courts analyze a particular issue, the Majority's application of the incorrect standard infects its entire analysis. I cannot join the Majority in its blatant disregard for the standards that guide this court.

**B. Because the Majority applied the wrong standard of review – engaging in a *de novo* review of the facts – and because the district court did not clearly err in finding that SB 205 and 216 disparately impacted African American voters, the district court's findings of fact and legal conclusions on Plaintiffs' VRA claims should be affirmed.**

The Supreme Court has instructed that the Voting Rights Act "should be interpreted in a manner that provides 'the broadest possible scope' in combating racial discrimination." *Chisom*

---

[60]Clear error review also applies "to the district court's finding that the [regulations impose] . . . a burden on African Americans' right to vote in Ohio." *Ohio Democratic Party v. Husted*, No. 16-3561, 2016 WL 4437605, at \*17 (6th Cir. Aug. 23, 2016) (Stranch, J., dissenting) (citing *OFA v. Husted*, 697 F.3d 423, 431 (6th Cir. 2012) (concluding that the district court did not clearly err in finding that "early voters, who have disproportionately lower incomes and less education than election day voters," were burdened by challenged regulation)). Here, the district court concluded that "demanding perfect, or near-perfect, adherence to the five-field requirement on ballots imposes a significant burden for homeless voters, who are some of society's most vulnerable members." This conclusion should not be disturbed absent clear error.

*v. Roemer*, 501 U.S. 380, 403 (1991) (quoting *Allen v. State Bd. of Elections*, 393 U.S. 544, 567 (1969)).  In vote-denial cases, courts conduct a two-part analysis.  *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 240 (4th Cir. 2014).  First, a court determines whether a practice or procedure has a disparate impact on a minority group.  *See Thornburg v. Gingles*, 478 U.S. 30, 44 (1986).  Second, if it finds disparate impact, the court assesses whether the "electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  *Id*. at 47.  In applying the test, the court considers "the totality of circumstances."  52 U.S.C. § 10301(b).

### 1.  Disparate Impact

Here, the district court did not commit clear error in finding "SB 205 and SB 216 have a disproportionate impact on African-American voters in Ohio, creating greater risk of disenfranchisement of African-Americans than whites."  *Husted*, 2016 WL 3166251, at *47. The district court further concluded that "[t]he burdens imposed on voters by the five-field requirement, the prohibition on poll-worker assistance, and the reduced cure period fall more heavily on African-Americans than whites."  *Id.*

The Majority contravenes a clearly erroneous standard of review by reweighing and reassessing the evidence to reach the conclusion that African American's are not disparately impacted by the new legislation.  After years of litigation, a twelve-day trial, and painstakingly combing the record, the district court found that Dr. Timberlake's data on disparities in provisional and absentee ballot usage and rejection rates reveal that higher minority population share is correlated to higher rates of absentee ballot rejection and provisional ballot usage and rejection.  *Husted*, 2016 WL 3166251, at *47.  In support of its conclusion, the district court cited the following findings of fact:

> [T]he Court credits Dr. Timberlake's findings that: (1) in the presidential election years of 2008 and 2012, where minority turnout was higher than during typical midterm elections, *minorities' absentee ballots were rejected at a higher rate than whites'*; (2) in 2008, 2010, 2012, and 2014, minorities cast provisional ballots at a higher rate than whites; [This finding is also corroborated by studies upon which Dr. Timberlake relied that showed that African-American voters use provisional

ballots at a higher rate than white voters nationwide. (*See* Timberlake Rebuttal Rpt., P-1195 at PTF-243.)] and (3) in 2008, 2010, and 2012, *minorities had higher rates of rejection of provisional ballots than whites.*

*Husted*, 2016 WL 3166251, at \*48 (emphasis added).

The district court therefore concluded that "because of the passage of the challenged laws, African-American voters are more likely than white voters to have their absentee or provisional ballots rejected." *Id.* Despite the district court's well-reasoned findings, the Majority reinterprets and reweighs the evidence to conclude that Dr. Timberlake's findings do not support the conclusion that minorities are disparately impacted by the challenged laws.

In so doing, the Majority makes much of the decrease in the use of absentee ballots in the 2012 and 2014 elections. However, again the Majority avers where the district court directly addressed the argument in a manner that was not clearly erroneous. Totally disregarding the district court's factual determinations and explanations, the Majority discounts the district court's explanation for the decrease in absentee ballots: "Plaintiffs presented evidence that the gubernatorial election was significantly less competitive in 2014 than in 2010, that overall turnout was lower in 2014 than 2010. *Husted*, 2016 WL 3166251, at \*48. Given this plausible explanation, the district court did not clearly err.

Further, under either standard of review, the Majority's analysis still falls short. The Majority's reasons for rejecting the district court's factual findings are unavailing because the reasons suffer from at least three major analytical flaws. First, the Majority misinterprets the evidence. Second, the Majority fails to apply a totality of the circumstances standard. Third, the Majority errs in its conclusion regarding the undue burden.

First, the Majority misinterprets the evidence. For example, the Majority reasons as follows:

[T]here is scant evidence in the record that minority voters are more likely to cast absentee ballots than white voters. It would therefore be illogical to infer that rejecting absentee ballots for failure to accurately complete address and birthdate fields disproportionately affects minority voters without some other evidence that minority voters are less likely to fulfill that requirement. And . . . the vast

majority of absentee-ballot rejections are for reasons other than those challenged here.

By relying on the "scant evidence" that minority voters are more likely to cast absentee ballots than white voters, the Majority again misses the mark. While evidence that minorities avail of a voting practice more frequently than whites *can* support a Section 2 claim, it is not a *necessary component* for such a claim; minority voters may only show that they are more likely to have their ballots rejected than white voters because of the new requirements, which means they have "less opportunity than" white voters to exercise their right to vote. *See Chisom*, 501 U.S. at 395.

Second, the Majority applies the wrong legal test by considering the impact of each individual legislative change, rather than considering the disproportionate impact that the new Ohio voting requirements have on minorities as a whole. The Majority engages in a piecemeal freeze frame approach to the evidence finding that each new requirement alone in a vacuum does not meet the standard for disparate impact. Even faced with evidence that minority absentee ballots are rejected more frequently than white absentee ballots, the Majority asserts that this distinction means nothing unless there is "some other evidence" that minority voters are less likely to correctly fill out the birthdate and address requirements. The Majority's requirement that the plaintiff must establish the disproportionate impact of *each* requirement imposes too great a burden. This approach does not comport with Section 2's mandate to consider the "totality of the circumstances." Indeed, at least one circuit has cautioned against the very approach the Majority takes here. *See League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 245 (4th Cir. 2014).

In *League of Women Voters*, the challenged house bill contained several new "electoral mechanisms." *Id.* at 242. That house bill, among other things, "imposed strict voter identification requirements, cut a week off of early voting, prohibited local election boards from keeping the polls open on the final Saturday afternoon before elections, and eliminated same-day voter registration." *Id.* at 228. The district court analyzed each challenged electoral mechanism separately. *Id.* at 242. But the Fourth Circuit criticized the district court for "inspecting the parts of [the] [bill] as if they existed in a vacuum." *Id.* at 242. Specifically, the district court "failed to

consider the sum of those parts and their cumulative effect on minority access to the ballot box." *Id.* "Doing so is hard to square with Section 2's mandate to look at the '*totality of circumstances.*'" *Id.* (emphasis added) (quoting 52 U.S.C. § 10301(b)). We should be mindful that "a panoply of regulations, each apparently defensible when considered alone, nevertheless have the combined effect of severely restricting participation . . . ." *Id.* (quoting *Clingman v. Beaver*, 544 U.S. 581, 607–08 (2005) (O'Connor, J., concurring in part and concurring in the judgment)). The Majority's approach creates the incentive for state legislatures to pass numerous electoral mechanisms so that courts are forced to put on blinders when it comes to understanding the combined effect of these mechanisms.

Third, the Majority errs in its conclusion regarding the undue burden. The Majority states that no undue burden exists because there was no evidence that voters received additional poll-worker assistance before the new requirements. However, disparate impact does not require such exact mathematical quantification. It is enough that there is a high likelihood of such assistance being needed given the interplay of structural inequalities with the challenged provisions as the district court correctly found under the governing standard. The Majority has not and cannot cite any legal precedent for such exacting standards, numbers, or data—nor should any be required. The Majority acknowledges that race is not recorded on ballots, but uses this absence of required information to make the self-invalidating argument that finding racial impact is impossible. This deft maneuver again contravenes the standard of review. Such reasoning and stealth of hand sets a very dangerous precedent.

I, therefore, dissent from the Majority's finding that the district court erred in finding that the Plaintiffs satisfied the first prong of their vote denial claim—disparate impact—and would affirm.

### 2. Social and Historical Conditions

Furthermore, the district court's findings of fact with respect to the second prong—social and historical conditions—were a product of the district court's careful application of the so-

called "Senate" factors or "*Gingles*" factors.[61]  The factors from *Thornburg v. Gingles*, 478 U.S. 30, 79 (1986) "might be probative" of a Section 2 violation.  *See Michigan State A. Philip Randolph Inst. v. Johnson*, No. 16-2071, 2016 WL 4376429, at \*7 (6th Cir. Aug. 17, 2016).  The factors include:

> (1.) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
>
> (2.) the extent to which voting in the elections of the state or political subdivision is racially polarized;
>
> (3.) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
>
> (4.) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
>
> (5.) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
>
> (6.) whether political campaigns have been characterized by overt or subtle racial appeals;
>
> (7.) the extent to which members of the minority group have been elected to public office in the jurisdiction;
>
> (8.) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and
>
> (9.) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

---

[61]"[T]he Supreme Court has also endorsed factors ("the *Gingles* factors") enunciated by Congress to determine whether [disparate] impact is a product of current or historical conditions of discrimination such that it violates Section 2." *Veasey v. Abbott*, No. 14-41127, 2016 WL 3923868, at \*17 (5th Cir. July 20, 2016); *see also Michigan State A. Philip Randolph Inst. v. Johnson*, No. 16-2071, 2016 WL 4376429, at \*13, n.2 (6th Cir. Aug. 17, 2016).

*See Gingles*, 478 U.S. at 36–37. The district court made findings on all but the fourth factor. I summarize below.

Analyzing factors one and three together, the district court noted the strong history of "Ohio's racially discriminatory voting laws." Although the district court noted the history of Ohio's racially discriminatory voting practices from several decades ago, it also discussed recent discriminatory bills passed after the 2008 election.

As to the second factor, the district court noted that exit polls from Ohio voters in the 2012 presidential election suggest significant and substantial patterns of racially polarized voting. "Approximately, 41% of white voters and 96% of African-Americans reported voting for President Barack Obama—an enormous differential."

As to the fifth Senate factor, the district court noted the barriers faced by African Americans to participation in the political process. Indeed, the district court noted that persistent levels of discrimination faced by African Americans in "employment, housing, income, education and health."

As for factor six, the district court found that there are racialized appeals in politics in Ohio. Such appeals "serve to discourage or dissuade minority voters and prospective candidates by reinforcing the message that they simply do not belong in the political process and/or by mobilizing white voters in a particular direction by playing on insidious, sometimes explicit and sometimes implicit, stereotypes." The district court further cited as examples racialized statements made by public officials and referred to disparaging commercials.

Nor was the district court convinced that there was minority representation in Ohio (factor seven). As an example, no African American presently holds the position of Governor, Lieutenant Governor, Attorney General, Auditor, Secretary of State, and State Treasurer. African Americans have occupied each of these positions only five times in the history of the State. Until recently, and for the first time in sixty years, the Governor's twenty-six-person cabinet was entirely white.

As to factor eight, the district court found that not many of the "socioeconomic disparities have improved in recent years," demonstrating Ohio's lack of responsiveness to the particularized needs of African-American Ohioans. Disparities in unemployment have remained steady as well. Finally, as to factor nine, the district court found that Ohio's primary justification for the challenged laws at issue is that the they improve "election administration," but those justifications were tenuous.

Because Ohio does not challenge any of the district court's factual findings pursuant to *Gingles* on appeal, those factual findings are binding on this panel. *McElwee v. Wharton*, 7 F. App'x 437, 438 (6th Cir. 2001) ("The district court's unchallenged factual findings . . . are binding on this Court.") (per curiam); *see also Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 542 (6th Cir. 2003) ("[B]ecause [the] [p]laintiff has not directly challenged the district court's factual conclusions . . . all factual controversies are deemed abandoned on appeal and the district court's factual findings are hereby upheld.").

While the Majority never reaches the issue because it holds that Plaintiffs' Section 2 claim fails in its infancy, a careful review of the district court's factual findings pursuant to *Gingles* reveals that the challenged practice is "caused by or linked to 'social and historical conditions' that have or currently produce discrimination against members of the protected class." *See Michigan State A. Philip Randolph Inst. v. Johnson*, No. 16-2071, 2016 WL 4376429, at *7 (6th Cir. Aug. 17, 2016) ("The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." (quoting *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986))). Accordingly, I would affirm the district court's holding with respect to the Section 2 Voting Rights Act claim.

Furthermore, I would affirm the district court's findings with respect to both prongs of the vote denial claims as they apply to the restrictions on poll workers and the reduced time to cure. In support of its findings of vote denial on the poll worker restrictions and the reduced time to cure, the district court stated the following:

> Because low literacy levels are also correlated with substandard education (Timberlake Tr., Vol. 5 at 73), and the Court has credited Dr. Timberlake's

findings that African-Americans suffer from lower educational attainment than whites in Ohio, the Court concludes that African-Americans would also suffer from higher costs associated with the five-field requirement and the prohibition on poll-worker assistance because they would face disproportionately more challenges filling out the forms. Because African-Americans move more frequently than whites, they may be more likely to be forced to vote provisionally. (*Id.* at 67-68; *see also* Hood Tr., Vol. 10 at 121, 124.) They are also more likely to be homeless. (Davis Tr., Vol. 4 at 186.) And because they are more likely to have inflexible schedules or lack access to a car, they are more likely to be burdened by a shorter cure period for absentee and provisional ballots. (Timberlake Tr., Vol. 5 at 61-62.) All of these effects of discrimination against African-Americans combine to create an inequality in their opportunities to participate in the political process.

*Husted*, 2016 WL 3166251, at *52.

Given these structural inequalities and the impact of the poll worker restrictions and the shortened cure period, the district court did not clearly err.

## C. The Majority Fundamentally Misunderstands the Concept of Disparate Impact

Additionally, the Majority fundamentally misunderstands the concept of disparate impact. A particular practice has a disparate impact on persons of a protected class when that practice has a "disproportionate" impact on the members of the protected class. *See, e.g.*, *Alexander v. Local 496, Laborers' Intern. Union*, 177 F.3d 394, 419 (6th Cir. 1999) ("In a so-called 'disparate impact' case, the plaintiffs need not prove that the defendant intended to discriminate; instead, plaintiffs must prove that a particular [] practice, although neutral on its face, has caused a *disproportionate* adverse effect on a protected group.") (emphasis added); *Chrisner v. Complete Auto Transit, Inc.*, 645 F.2d 1251, 1257 (6th Cir. 1981).

In some instances, after simply counting the number of persons affected by the new Ohio voter identification laws, without making any comparisons between minority and non-minority voters to assess the disproportionality of those numbers, the Majority concludes that the voting practices in Ohio do not have a disparate impact because only a small number of voters are affected by the new laws. Disproportionality, by definition, requires assessing racial disparities. *See Alexander*, 177 F.3d at 419 (noting that "statistical evidence is not absolutely essential in proving a disparate impact case," but there "must be proof of disparity using the proper standards

of comparison"). By relying on the sheer number of voters affected by the law in isolation, without making any relevant comparisons, the Majority fails to engage in any disparate impact analysis at all. The Majority merely engaged in a counting exercise that gets us nowhere in terms of analyzing the discriminatory impact of a rule or practice.

Next, the Majority concludes that "[a] law cannot disparately impact minority voters if its impact is insignificant to begin with." The text of the Voting Rights Act itself proves this statement to be false. Section 2 of the Voting Rights Act provides, in relevant part, that a violation is established if:

> . . . based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have *less opportunity than other members* of the electorate to participate in the political process and to elect representatives of their choice.

*Chisom v. Roemer*, 501 U.S. 380, 395 (1991) (quoting Sect. 2, Voting Rights Act). Tellingly, the Majority cites no legal authority for the proposition that in order for a practice to be discriminatory, its "impact" must also be "significant." Quite simply, a violation of Section 2 of the Voting Rights Act does not turn on whether people are being discriminated against in "significant" numbers, it turns on whether minorities have "less opportunity than" non-minorities to vote. *See id.*[62] Moreover, although the ballots of minorities and the homeless may be insignificant to the Majority, they are not insignificant to the basic principles of the VRA, which does not require a certain number of affected persons, but looks instead at the impact on minorities as compared to non-minorities.

**D. The Majority Applies the Wrong Legal Standard for the Equal Protection Claim**

With respect to the Equal Protection Clause claim, I agree with the Majority's implicit rejection of Ohio's argument that rational-basis review applies. I further agree that the *Anderson/Burdick* balancing test applies instead. But the Majority's application of the test

---

[62]Further, the impact of SB 205 and 216 was certainly significant enough for the Ohio legislature to take action, for legislators to invest the time and energy in getting the laws passed, in defending a claim in a twelve-day trial, and absorbing the time of this court on appeal. The Majority's claim that the impact of the new legislation is insignificant is belied by reality.

cannot be reconciled with Sixth Circuit precedent. The Majority takes issue with the district court's consideration of the burdens imposed by the challenged provisions on NEOCH's and CCH's homeless members. The Majority relies in part on Justice Scalia's concurrence in *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008), which states that "what petitioners view as the law's several light and heavy burdens are no more than the different *impacts* of the single burden that the law uniformly imposes on *all* voters." *See Crawford*, 553 U.S. at 205 (Scalia, J. concurring in judgment) (second emphasis added). The Majority then proceeds to "consider the burden that the provisions place on *all* Ohio voters." (Emphasis added).

The Majority's approach is incorrect. In *Crawford*, a plurality of the Supreme Court held that an Indiana statute that required citizens voting in person on election day or casting in person a ballot before election day was constitutional. *Crawford*, 553 U.S. at 185, 204. We have previously held that Justice Stevens' opinion is controlling for *Marks*[63] purposes, *see Obama for America v. Husted*, 697 F.3d 423, 441 n.7 (6th Cir. 2012) ("*OFA*"), and Justice Stevens, quite simply, did not make the same assertion that Justice Scalia made. *See also Ohio State Conference of N.A.A.C.P. v. Husted*, 768 F.3d 524, 544 (6th Cir. 2014), *vacated sub nom. Ohio State Conference of The Nat. Ass'n For The Advancement of Colored People v. Husted*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014) ("A majority of the justices in *Crawford* either did not expressly reject or in fact endorsed the idea that a burden on only a subgroup of voters could trigger balancing review under *Anderson–Burdick*.").

In *Crawford*, a plurality of the Supreme Court acknowledged that, although for most voters it is not a substantial burden to comply with a photo ID requirement, a "somewhat heavier burden may be placed on a limited number of persons . . . includ[ing] elderly persons born out of State, who may have difficulty obtaining a birth certificate[,] . . . homeless persons[,]" and others. 553 U.S. at 198-99. Although the *Crawford* Court rejected the plaintiffs' argument that the law should be enjoined on the basis of the burden to that smaller group of voters, it did so because the record in that case did not contain evidence of the specific burdens imposed on those vulnerable groups. *Id.* at 201-02. Because the record was virtually devoid of evidence that

---

[63]*Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.")

would have allowed the Court to measure the "magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified," *id*. at 200, the Court considered only the burden on all Indiana voters, which it determined was only "limited." *Id*. at 203.

That the Majority here has decided to pluck one line from Justice Scalia's concurrence to identify the appropriate legal test for analyzing Plaintiffs' equal-protection claim, is deeply misguided. The Majority, as a result, applies the wrong standard. Under the Majority's approach, no longer must we inquire as to how a voting regulation affects different groups of people—something I thought was the cornerstone of equal-protection jurisprudence. Instead, we must inquire whether a voting regulation burdens *everyone*, and only when it does, will that regulation be deemed *unequal*. This conclusion defies both logic and common sense.

Even if simple logic did not counsel against the Majority's approach, then our circuit precedent surely does. *See OFA*, 697 F.3d at 431. In *OFA*, the challenged regulation in effect reduced the number of days available for in-person voting by three days. *Id.* This court concluded that the district court did not clearly err in finding that "early voters, who have disproportionately lower incomes and less education than election day voters," were burdened by the challenged regulation. *Id.* Put another way, this court studied the impact of the challenged law on certain groups. *See id.* Quite simply, despite the Majority's assertions that a law must impact everyone for it to violate the Equal Protection Clause, *Crawford* does not dictate or mandate such an analytical framework.

In sum, I would use the *Anderson/Burdick* balancing test to examine whether Ohio's interests outweigh the burdens imposed on Ohioan homeless individuals[64] on the basis of the three new requirements: (1) the birthdate and address forms requirement; (2) the reduction in the cure period; and (3) the restrictions on poll-worker assistance. As to the first requirement, the Majority and I are in agreement that the address and birthdate forms requirement violates the Equal Protection Clause, even though I disagree with the Majority's analytical approach in

---

[64]The district court found that approximately 60% of the homeless persons in shelters in Columbus, Ohio are African American and approximately 70% of NEOCH's in-person homeless applicants are African American.

reaching that conclusion. Nevertheless, because the first requirement is not a point of contention, I focus on the remaining two.

*Reduction in cure period.* The district court ruled that the reduction of the cure period, for absentee voters, would be "especially burdensome for voters with low literacy who may need to seek assistance in reading the Form 11-S[65] and filling it out before returning it to the Board." Thus, "[l]imiting the window in which they may cure a deficient ballot imposes a significant burden on homeless, impoverished, and illiterate voters."[66] *Husted*, 2016 WL 3166251, at *39. For provisional voters, "the opportunity to cure . . . ballots is limited to providing ID that they failed to provide when they voted . . . ." *Id*. at 18.

Ohio characterizes the limitation as an "inconvenience" that does not constitute a burden. Ohio cites numerous testimonies indicating that few individuals avail of the cure-period in any case, and further, "Plaintiffs identified no person harmed by the three-day difference." In proffering an interest, Ohio states that the reduction serves to provide a "workable stopping point before election officials must begin the official canvas" eleven days after Election Day. The district court was not persuaded by the interest. "Of the *twenty-one* Board officials who testified at trial, *not one* indicated that he or she had experienced any inconvenience or increased cost during the pre-2014 ten-day cure period, or stated that the county Board needed extra time between the conclusion of the cure period and the start of the canvass to address any particular matters." No board official mentioned any "specific task[] that needed to be conducted between the end of the cure period and the beginning of the canvass."

Ohio contends that because the cure period was rarely used, reduction of that period was justified. But that argument cuts the other way—if that period was rarely used, then it would not matter if the cure period remained at ten days rather than at seven days. Given that no board official testified that a "specific task" needed to be conducted before the canvas, it appears that Ohio has not struggled to cope with a ten-day cure period. In these circumstances, Ohio has not

---

[65]If there is an error in any of the five fields on an absentee ballot, the Board mails a "Form 11-S," specifying the type of error and informing the voter that the ballot will not be counted unless certain steps are taken—namely, returning the Form 11-S by a certain time.

[66]Notably, it is unclear what channels the homeless individuals would use to receive the Form 11-S in the mail in time to cure the defect because these individuals are often transient with no fixed address.

shown that its interest outweighs the burdens imposed. *See OFA*, 697 F.3d at 434 ("With no evidence that local boards of elections have struggled to cope with early voting in the past, no evidence that they may struggle to do so during the November 2012 election, and faced with several of those very local boards in opposition to its claims, the State has not shown that its regulatory interest in smooth election administration is 'important[.]'"). It should be noted that defendant bears the burden of justification. Because the defendant failed to meet even the minimum threshold of that burden, the district court did not clearly err.

The Majority says that there is no need for Ohio to wait for a problem to arise in the last three days of the cure period in order to act; however, that analysis misses the point. If there was no problem in the last three days, the action lacks any justification under any standard of review. Lacking any justification, the district court's findings were simply not erroneous.

*Prohibition against poll-worker assistance*. We must "weigh the character and magnitude of the asserted injury to the" protected rights against "the precise interests put forward by the State as justifications for the burden imposed by its rule." *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992). The district court made careful factual findings that Plaintiffs' constituents were illiterate, barely literate, or suffering from disability or mental illness, which limited their ability to complete basic voting-related tasks. Although it is true that illiterate and disabled workers may receive assistance in filling out the form, an official testified that "Board staff members were more hesitant to engage with voters and offer help when it appeared to be necessary." Thus, in light of the district court's crediting this testimony, the district court's finding that the limitation of poll-worker assistance was burdensome is not clearly erroneous. The district court then found lacking the State's justifications for preventing poll workers from assisting voters who do not affirmatively ask for help because they are illiterate or disabled. *Husted*, 2016 WL 3166251, at *39. The district court's findings were not clearly erroneous.

A close reading of the Majority's opinion reveals that the Majority's calibrations are misaligned. On the one hand, the Majority concludes that because there is no evidence of voter fraud, Ohio's asserted interest in protecting against voter fraud does not outweigh the burden placed on the voters by the address and birthdate requirements. Yet in the same breath, the Majority concludes that "Ohio's legitimate interest in minimizing election-official mistakes by

ensuring that they are not overburdened and do not fill in others' personal information justifies the limitation placed on poll-worker assistance" *even though there is no evidence that* the poll workers were overburdened or that there were problems with others filling in personal information.[67]

Moreover, the Majority reiterates that the impact on voters is small and insignificant. However, the Majority fails to cite any legal precedent that mandates a certain mathematical quantum because none is required. Furthermore, the complete lack of sensitivity and unbridled privilege with which the Majority exercises its view of the trivial is exactly what led to the constitutional and statutory protections at issue in this case. Still further, as I have stated throughout this dissent, the stakes of these proceedings are hardly small, insignificant, or trivial; instead, the impact is worthy of countless hours of the Ohio congressional time, energy, and efforts in not only passing these restrictive measures, but defending them. The rush to set forth and pass these measures belies any claim that what is at stake is slight, minor, unimportant, trifling, trivial, insignificant, inconsequential, negligible, nugatory, or infinitesimal. Similarly, the Majority continues to point out that the vast Majority of challenged ballots are struck for reasons that do not involve SB 205 and 216; however, our inquiry is the impact on those voters whose ballots SB 205 and 216 does disparately affect.

In sum, because I conclude that the burdens of the challenged laws outweigh the government's purported interests under the *Anderson/Burdick* balancing test, I would affirm the district court's judgment in favor of Plaintiffs with respect to the Equal Protection Clause claim.

<u>**CONCLUSION**</u>

The Majority applies the wrong legal tests, misapprehends the basic concept of disproportionality, and applies the wrong standard of review. Most disturbingly, the Majority substitutes its own view of the record for the carefully decided and supported factual findings of the district court. As the Supreme Court has cautioned, a "reviewing court oversteps the bounds of its duty . . . if it undertakes to duplicate the role of the lower court." *Anderson*, 470 U.S. at

---

[67]While the state "need not justify its laws with 'elaborate, empirical verification,'" *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 924 (6th Cir. 1998), the state does need to assert a real and "precise" interest against which the citizens' right to vote must be weighed. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

573. "The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Id.* at 574. "[P]arties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much." *Id.* at 575. Today, the Majority disregards the Supreme Court's well-established principles and substitutes its own view of the record for the carefully decided and supported factual findings of the district court.

The birth of this Nation was founded upon the radical principle that we, as a people, would govern ourselves. And voting is the ultimate expression of self-government. Instead of making it easier for all persons, unrestrained and unfettered, to exercise this fundamental right to vote, legislators are making it harder. States are audaciously nullifying a right for which our ancestors relentlessly fought and—in some instances—even tragically died. From that struggle came the Equal Protection Clause of the Fourteenth Amendment, and later, the Voting Rights Act. It is this court's responsibility to enforce both the Constitution and the statute, and thereby safeguard this precious right to vote. In my opinion, the Majority has failed to do just that. The Majority takes the position that unless a rule affects non-minorities, it does not run afoul of the Equal Protection Clause of the Fourteenth Amendment. This baffling position distorts the Equal Protection Clause so much so that the clause becomes unrecognizable, unenforceable, and fundamentally, unequal. For years, states have been (both stealthily and overtly) erecting hurdles to the right to vote. And the votes of those who are actually able to surmount those hurdles are often diluted through Gerrymandering. These states' actions of implementing rules and redrawing districts in an effort to restrict minorities' access to the ballots is another reminder that history repeats itself. It is yet another reminder that many people hold the misguided belief that only the privileged majority should be granted access to political power and adequate representation.

With every gain in equality, there is often an equally robust and reactive retrenchment. We must never forget that constant dialectical tension. For every action, there is a reaction. The Majority's decision is a fateful reminder that we can never fool ourselves into believing that we have arrived as a nation. Our decision today, and more decisions like this one, will undoubtedly

shape the future of this Nation because deciding who gets to vote inevitably affects who will become our leaders—a determination that is grounded in the principles long cherished and long pursued by our Founding Fathers. This is exactly why so many are actively seeking to etch away at the right to vote in assembly halls across this nation. These efforts are hardly insignificant or negligible. They are, for their proponents, necessary and highly deliberate. It is my hope that when future generations look back on these decisions, they conclude that we were on the right side of history. But today I fear that we were not.

For these reasons, I cannot concur with my colleagues in full. In the interest of clarity, I would affirm the district court and permanently enjoin the enforcement of portions of SB 205 and 216 that: require boards to reject the ballots of absentee and provisional voters who do not accurately complete the address and birthdate fields; reduce the cure period to seven days; prohibit most forms of poll-worker assistance; and require provisional voters to print their names on the affirmation form.